## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GERARDO MOTA BAUTISTA, HUGO BAUTISTA, JUAN LUIS OVANDO ZEPEDA, JUAN ZEPEDA, JULIO RICARDO ALVAREZ MACATOMA, LEONCIO TORRES ACUNA, MARIO MORALES ROJAS, OMAR RODRIGUEZ, and ANTONIO LIMON HERNANDEZ *individually and on behalf of others similarly situated*, | : |
| | : |
| PLAINTIFFS, | : |
| | : |
| VS. | :    CIVIL ACTION NO.: 19-CV-08808 |
| | : |
| | : |
| COUNTY-WIDE MASONRY CORP., CARBEN INDUSTRIES, INC., CARBEN CONCRETE, INC., CARBEN CONSTRUCTION, INC., ANTHONY DERASMO, ANTHONY LOGIUDICE, RONALD BROWNING, and MARTIN DOE a/k/a PERU | : |
| | : |
| DEFENDANTS. | : |
| | : |
| CARBEN INDUSTRIES, INC. | : |
| | : |
| THIRD PARTY PLAINTIFF, | : |
| | : |
| VS. | : |
| | : |
| BATRUME INDUSTRIES, INC. and COUNTY-WIDE CONSTRUCTION CORP., | : |
| | : |
| THIRD PARTY DEFENDANTS. | : |
| | : |

## CARBEN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**On the brief:**      Matthew Lakind, Esq.
Tesser & Cohen, P.C
946 Main Street
Hackensack, New Jersey 07601
(212)-226-1900
*Attorneys for Carben Defendants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 3

LEGAL ARGUMENT .............................................................................................. 16

     I.    PLAINTIFFS HAVE NOT PRODUCED ANY EVIDENCE THAT THEY WERE
          EMPLOYEES OF CARBEN ..................................................................... 16

     II.    PLAINTIFFS HAVE NOT PRODUCED ANY EVIDENCE THAT CARBEN AND
          COUNTY WIDE ACTED AS JOINT EMPLOYEES ............................... 20

     III.    COUNTY WIDE'S CROSS CLAIM FOR INDEMNIFICATION MUST BE
           DISMISSED AS A MATTER OF LAW ....................................................24

CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**CASES**             **PAGE(S)**

Bd. of Mgrs. of Olive Park Condo. v. Maspeth Props., LLC,
170 A.D.3d 645, 647, 95 N.Y.S.3d 344, 346, 2019 N.Y. App. Div. LEXIS 1595, *4, 2019 NY Slip Op 01554, 2, 2019 WL 1051897 ................................................................. 24

Carter v. Dutchess Comm. College,
735 F.2d 8, 12 (2d Cir. 1984) ................................................................. 16

Felder v. United States Tennis Ass'n,
27 F.4th 834, 843-844, 2022 U.S. App. LEXIS 5848, *15-17 ................................................................. 21

Gustafson v. Bell Atl. Corp.,
171 F. Supp. 2d 311, 328 (NYSD 2001) ................................................................. 24

Hart v. Rick's Cabaret Int'l, Inc.,
967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013); ................................................................. 16

Herman v. RSR Sec. Servs.,
172 F.3d 132, 144 (2d. Cir. 1999) ................................................................. 24

Morales v. Performance Master, Inc.,
2022 U.S. Dist. LEXIS 93335, *4-5, 2022 WL 1645088 ................................................................. 16

Yi Mei Ke v. J R Sushi 2 Inc.,
2022 U.S. Dist. LEXIS 22776, 2022 WL 1496576 ................................................................. 20

Zheng v. Liberty Apparel Co.,
355 F.3d. 61 (2nd Cir. 2003) ................................................................. 18, 19, 20

**OTHER AUTHORITIES**         **PAGE(S)**

Fair Labor Standards Act ................................................................. 1,3,16,24
New York Labor Law ................................................................. 1,16,24

## PRELIMINARY STATEMENT

Plaintiffs have alleged various unpaid wage claims under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"), against Carben Industries, Inc., Carben Construction, Inc., Carben Concrete, Inc., Anthony Loguidice and Ronald Browning (collectively, "Carben") . All of Plaintiffs' claims against Carben must be dismissed because Plaintiffs failed to put forth any evidence that they were directly "employed" by Carben, or that they were "jointly employed" by Carben and co-defendant County-Wide Masonry Corp. ("County Wide"). Consequently, there are no genuine issues of material fact, even when viewed in a light most favorable to Plaintiffs, that would prevent summary judgment from being granted in favor of Carben. Likewise, County Wide's cross claims against Carben must also be dismissed because those claims, based on contractual and common law indemnification, fail as a matter of law.

After completing discovery, the testimony elicited from Plaintiffs is that each was a laborer for two construction projects, one located at 120 Water St. in Manhattan and one located at 70 Schermerhorn St. in Brooklyn (collectively, the "Projects"). County Wide and Carben were among the numerous contractors who worked on these Projects. Carben's Statements of Material Facts and Plaintiffs' responses to same establish several key undisputed facts. No Plaintiff testified that they were employed by Carben directly and no evidence has been introduced that Carben was a joint employer of any plaintiff. Plaintiffs have not produced any evidence in discovery, including through interrogatory and deposition testimony, that Carben was in any way responsible for the hiring, firing, supervising, paying, or control over any of the Plaintiffs. Plaintiffs have not produced any evidence that anyone employed by Carben had any "control", significant or otherwise, over their work at the Projects.

Not one Plaintiff has claimed in depositions or anywhere else in discovery that any employee/representative of Carben had any supervisory control over them.  Plaintiffs, to a man, testified (through deposition or interrogatory answers) that they were employed by County Wide.

The simple fact is that County Wide hired Carben as a subcontractor for the Projects to provide labor and materials to perform certain concrete work.  Carben supplied the materials for the Projects, and Carben hired Batrume Industries, Inc. as its sub-subcontractor to provide labor necessary to perform the required work.  No Plaintiff has claimed or put forth any evidence that it was employed, directly or indirectly, by Carben.  Aside from the fact that Plaintiffs allege to have worked on the same Projects that Carben and County Wide worked on (along with countless other contractors), there is no connection between Carben and any of the Plaintiffs.  Plaintiffs do not deny this.

Plaintiffs have failed to adduce any evidence in discovery that they were directly employed by Carben, or jointly employed by Carben and County Wide.  Plaintiffs have not asserted any disputed issue of material facts with respect to either of these claims.  For these reasons, and those discussed in detail below, Carben is entitled to summary judgment dismissing all claims asserted against it by both Plaintiff and County Wide.

## STATEMENT OF FACTS

*(All facts listed below were contained in Carben's Rule 56.1 Statement of Material Facts, and the numbers below correspond to the numbered paragraphs in Carben's Rule 56.1 Statement of Material Facts.  The Exhibits referenced therein and in this Memorandum of Law are those that were attached to Carben's Rule 56.1 Statement of Material Facts.  Carben's Rule 56.1 Statement of Material Facts shall hereafter be referred to as "**Carben SOF**".)*

1. Plaintiffs' Complaint alleges several causes of action arising out of labor they allegedly provided to two construction projects located at 120 Water St., New York, NY (the "Water St." or "Manhattan" Project) and 70 Schermerhorn, Brooklyn, NY (the "Schermerhorn" or "Brooklyn" Project) (collectively, the "Projects") (**Exhibit A, Plaintiffs' Complaint**)

2. The causes of action include: 1) Violation of the minimum wage provisions of the FLSA, 2) Violation of the overtime provisions of the FLSA, 3) Violation of the NY Minimum Wage Act, 4) Violation of the overtime provisions of the NY State Labor Law, 5) Violation of the notice and recordkeeping requirements of the NY Labor Law, 6) Violation of the wage statement provisions of the New York Labor Law, 7) Recovery of Equipment Costs, and 8) Violation of the timely payment provisions of the NY Labor Law. (**Exhibit A**)

3. Anthony Logiudice and Ronald Browning were/are principals of Carben Industries, Inc., Carben Concrete, Inc., and Carben Construction, Inc., and they are named as individual defendants (all Carben defendants hereafter collectively referred to as "Carben").

4. Carben filed an Answer and Third Party Complaint against Batrume Industries, Inc. ("Batrume"), Carben's subcontractor on the Projects.  The Third Party Complaint against Batrume Industries, Inc. asserted counts for breach of contract and contractual indemnification to the extent any of Plaintiffs' claims were proven against Carben. (**Exhibit B, Carben Answer and Third Party Complaint**)

3

5. As will be discussed in more detail below, each of the Plaintiffs claim to have been employed by defendant County Wide Masonry Corp. and/or County-Wide Construction Corp., ("County Wide").  None of them claimed to have been employed or have any sort of relationship or dealings with Carben.

6. No evidence has been produced that would establish an employer-employee relationship between Carben and the Plaintiffs.  There are no issues of material fact.

**The Plaintiffs Do Not Claim they Were Employed by Carben**

7. Plaintiff *Gerardo Mota Bautista* testified that for the Water St. (Manhattan) and Schermerhorn (Brooklyn) Projects he was **only** employed by County Wide.  He testified that he was not employed by Carben Industries, Carben Concrete, or Carben Construction at any time. (**Exhibit  C, Gerardo Bautista Dep., T21:23-22:12, T22:20-23:9**)

   a. Mr. G. Bautista testified that he does not recall the name of the individual that hired him for the Manhattan Project but he knows that individual worked for "Country-Wide" (sic). (**Id., T25:17-26:2**)

   b. Mr. G. Bautista testified that his supervisor at the Manhattan job was an individual named "Peru". (**Id., T28:6-8**)

   c. Mr. G. Bautista testified that Peru was employed by "Country-Wide" (sic) and that he wore a hard-hat or shirt with the name "Country-Wide" on it. (**Id., T29:15-23**)

   d. Mr. G. Bautista testified that Peru would assign him tasks at the Manhattan Project and direct what hours he worked.  Mr. G. Bautista testified that another individual whose name he could not remember assigned him his tasks and hours at the Brooklyn Project.  Mr. G. Bautista testified that Peru was the person who sent him to the Brooklyn Project. (**Id., T29:10-30:4**)

    e. Mr. G. Bautista testified that to his knowledge, all of the Plaintiffs' listed in the caption of the Complaint were employed by "Country-Wide". (**Id., T35:11-36:13**)

    f. Mr. G. Bautista testified that the Plaintiffs' Complaint, indicating that he worked for any Carben defendant, is "false". (**Id., T36:18-22**)

    g. Mr. G. Bautista testified that prior to his deposition, he had never heard of Anthony Logiudice, Ronald Browning, or Batrume Industries. (**Id., T38:2-9**)

8. Plaintiff *Hugo Bautista* stated in his answers to interrogatories that he was employed by "Countywide" for the Water St. and Schermerhorn Projects. (**<u>Exhibit D</u>, Hugo Bautista Supp. Interrogatory Answers**)

9. Plaintiff *Juan Luis Ovando Zepeda* testified that he was employed **only** by "Country-Wide" (sic) from February through August of 2019. (**<u>Exhibit E</u>, Ovando Zepeda Dep., T9:19-10:4**)

    a. Referencing the Water St. (Manhattan) and Schermerhorn (Brooklyn) Projects, Mr. Ovando Zepeda testified that he was employed by "Country-Wide" for his work on each Project. (**Id., T10:5-10**)

    b. Mr. Ovando Zepeda testified that he was never employed by Carben Industries Incorporated, Carben Concrete Incorporated, or Carben Construction Incorporated for either of the Projects. He testified that he had never heard of these companies before his deposition, nor had he ever heard of a company called Batrume Industries. (**Id., T10:25-11:15; T20:8-10**)

    c. Mr. Ovando Zepeda had never heard the names of Anthony Logiudice or Ronald Browning prior to his deposition. (**Id., T20:18-23**)

    d.  Mr. Ovando Zepeda testified that Mr. Peru paid him weekly on both Projects. (**Id., T21:7-9**)

    e.  Mr. Ovando Zepeda testified that his day-to-day work involved putting iron down on top of cement, and that another company (not Country-Wide) would put the cement down. (**Id., T14:7-25**)

    f.  Mr. Ovando Zepeda testified that the claim in the complaint that he worked for all "defendants" (including Carben) is incorrect because he was only employed by County Wide. (**Id., T22:17-24:10**)

10. Plaintiff *Juan Zepeda* stated in his answers to interrogatories that he was employed by "Countywide" for the Water St. and Schermerhorn Projects. (**Exhibit  F, Juan Zepeda Supp. Interrogatory Answers**)

11. Plaintiff *Julio Ricardo Alvarez Macatoma* stated in his answers to interrogatories that he was employed by "Countywide" for the Water St. and Schermerhorn Projects. (**Exhibit G, Macatoma Supp. Interrogatory Answers**)

12. Plaintiff *Leoncio Torres Acuna* testified that his claim relates **solely** to his employment with County Wide, for whom he worked from March of 2019 until August of 2019 on the Brooklyn and Manhattan Projects (Water St. and Schermerhorn). (**Exhibit H, Acuna Dep. Transcript, T9:25-11:10**)

    a.  Mr. Acuna testified that Juan Zepeda, a foreman for County Wide, helped get him hired by County Wide. (**Id., T11:14-18**)

    b.  He testified that a person named "Perucho" formally hired him for the Brooklyn Project, and he believed this person worked for County Wide. (**Id., T12:17-12:24**)

    c.  Mr. Acuna testified that "Perucho" was present at both jobsites daily and was his supervisor at those Projects. (**Id., T14:7-14**)

    d.  Prior to his deposition, Mr. Acuna had never heard the names of Carben Industries, Inc., Carben Concrete, Inc., Carben Construction, Inc., Anthony Logiudice, Ronald Browning, or Batrume Industries. (**Id., T14:15-15:13**)

    e.  Mr. Acuna testified that "Perucho" would issue him payments for work on the Projects. (**Id., T17:4-5**)

13. Plaintiff *Mario Morales Rojas* testified that he was employed by County Wide for about 6-7 months beginning in March of 2019. (**Exhibit I, Rojas Dep. T9:16-10:5**)  Mr. Rojas testified that he performed carpentry work for County Wide during this time. (**Id.**)

    a.  During his time employed by County Wide, Mr. Rojas testified that he worked on the two Projects located in Brooklyn and Manhattan. (**Id., T10:18-11:8**)

    b.  Mr. Rojas testified that he believed two people were involved in hiring him for County Wide, one by the name of Martin Peru. (**Id., T11:23-12:12**)

    c.  Mr. Rojas described Mr. Peru as a foreman who worked for County Wide. (**Id., T12:23-13:9**)  Mr. Rojas testified that he believed Mr. Peru worked for County Wide because he was the one who would pay him and the other workers, and because Mr. Peru told Mr. Rojas that he worked for County Wide. (**Id.; Id. at T22:3-5**)

    d.  Mr. Rojas testified that while he worked for County Wide on the Manhattan Project, he and the other employees were given tee shirts that said "County-Wide" on them. (**Id., T13:13-17**)

    e.  Mr. Rojas testified that he was supervised by Martin Peru. (**Id., T15:13-14**)

f.  Mr. Rojas testified that he has never heard of a company called Carben Concrete Incorporated, Carben Industries Incorporated, Carben Construction Incorporated, or Ronald Browning. (**Id., T19:13-24**)  Mr. Rojas testified that he has never heard of a company called Batrume Industries. (**Id., T26:7-8**)

g.  Mr. Rojas testified that he recalled hearing the name of Anthony Logiudice at a project meeting but he has never met Mr. Logiudice and does not know who he is or who he worked for. (**Id., T16:15-17:12**)

h.  Mr. Rojas testified that he wore an I.D. badge during his time on the Brooklyn Project and his counsel stated during his deposition that the badge said "Noble Construction and "County-Wide" on it. (**Id., T18:24-19:12**)

14. Plaintiff *Omar Rodriguez* testified that he constructed ladders that would go up the buildings at the Brooklyn and Manhattan Projects. (**<u>Exhibit J</u>, Rodriguez Dep., T9:11-25**)

a.  Mr. Rodriguez testified that he worked for County Wide from March until April of 2019 on the Brooklyn Project, and from April until August of 2019 on the Manhattan Project. (**Id., T11:19-23**)

b.  Mr. Rodriguez testified that during this time he did not work for any other company aside from County Wide. (**Id., T12:8-15**)

c.  Mr. Rodriguez later testified that he did not know how to respond to a question about whether County Wide was his only employer at the Brooklyn and Manhattan Projects.  He testified that he was only given information on what his job would be and what his salary would be, but he did not obtain any information about "the names of the companies that are there." (**Id., T15:4-20**)

    d.  Mr. Rodriguez testified that the name of the Project Manager for the Projects, and the man who hired him, was a man called "Martin" or "Peru." Mr. Rodriguez testified that Martin Peru worked for County Wide. (**Id., T15:21-16:17**)

    e.  Mr. Rodriguez testified that at the Brooklyn job-site, he, Mr. Peru, and all the workers at the job site "would use clothing that would identify us as workers from Country-Wide. (sic)" (**Id., T17:12-17**)

    f.  Mr. Rodriguez testified that Mr. Peru was his "superior" for both Projects. (**Id., T18:11-13**)

    g.  Mr. Rodriguez testified that the name of the worker who was in charge of constructing the stairs at each Project was named "Edgar" and he worked for County Wide. (**Id., T18:21-19:8**)

    h.  Mr. Rodriguez testified that Mr. Peru would pay him on both Projects. (**Id., T21:11-12**)

    i.  Mr. Rodriguez testified that at the Manhattan Project, he would sign a sign-in sheet to "go in and come out."  Mr. Rodriguez testified that the person who would give him that sign-in sheet was named Gregorio or El Flaco and he worked for County Wide. (**Id., T23:19-24:12**)

    j.  Mr. Rodriguez testified that he did not recall hearing the names of Anthony Logiudice or Ronald Browning before his deposition. (**Id., T36:8-13**)

15. Plaintiff *Antonio Limon Hernandez* stated in his answers to interrogatories that he was employed by "Countywide" for the Water St. and Schermerhorn Projects. (**<u>Exhibit K</u>, Hernandez Supp. Interrogatory Answers**)

9

**The Relevant Carben-County Wide Contracts for the Projects**

16. On or about January 15, 2019, Carben Construction Inc. executed a sub-subcontractor agreement with County-Wide Construction Corp. ("County Wide" or "CW") to act as County Wide's sub-subcontractor for a construction project located at 120 Water Street, New York, NY (the "Water St. Project"). (**Exhibit L, 120 Water St. CW Contract**)

17. For the 120 Water St. Project, County Wide had been retained to act as a subcontractor on behalf of the General Contractor for that Project, The Rinaldi Group. (**Exhibit L, par. 1.1**)

18. On or about January 15, 2019, Carben Industries, Inc. (also referred to as "Carben") entered into a Sub-Subcontract agreement with Defendant, County-Wide Masonry Corp. (also referred to as "County Wide" or "CW") to act as County Wide's sub-subcontractor for a construction project located at 70 Schermerhorn, Brooklyn, New York (the "Schermerhorn Project"). (**Exhibit M, 70 Schermerhorn CW Contract**)

19. For the Schermerhorn Project, County Wide had been retained to act as a subcontractor on behalf of the General Contractor/Construction Manager for that Project, Noble Construction Group, LLC. (**Exhibit M, par. 1.1**)

20. At no time did Anthony Logiudice or Ronald Browning execute any contract documents related to either of the Projects that would have bound them personally.

21. Anthony Logiudice testified that the scope of work for both the Water St. Project and the Schermerhorn Project called for Carben to provide materials and labor necessary to complete certain "concrete superstructure" work identified within the respective contracts for each Project. (**Exhibit N, Logiudice Deposition, T25:10-12, T T34:22-35:23**)

**The Carben-Batrume Subcontract Agreements for the Projects**

22. As noted above, none of the Plaintiffs claimed they were employed by Carben, nor did any Plaintiffs claim that they were employed by Third Party Defendant, Batrume Industries, Inc.

23. Anthony Logiudice testified that for each Project, Carben supplied the materials and hired a subcontractor, Batrume Industries, Inc. ("Batrume") to perform all labor for the Projects. (**Exhibit N, Logiudice Deposition, T26:8-10; T34:22-35:23**)

24. Anthony Logiudice testified that it is Carben's general practice, that when it contracts for a construction Project such as the Water St. and Schermerhorn Projects, Carben will supply the materials and it will hire a subcontractor to perform the labor for that job, including those at issue herein. (**Exhibit N, Logiudice Deposition, T22:2-23:2**)

25. Michael Garrido, an owner/principal with Batrume, signed the subcontracts between Carben and Batrume for each Project. (**Exhibit O, Carben-Batrume Schermerhorn Subcontract; Exhibit P, Carben-Batrume Water St. Subcontract**)

26. Batrume and Carben executed their Subcontract Agreement for the Schermerhorn Project on or about March 8, 2019. (**Exhibit O**)

27. Batrume and Carben executed their Subcontract Agreement for the Water St. Project on or about April 15, 2019. (**Exhibit P**)

28. Both contracts between Batrume and Carben state that Batrume is acting as an independent contractor and any personnel supplied by either party shall be deemed employees of that party.  Batrume and Carben agreed that they were not entering into any joint-venture, partnership, or principal-agent relationship. (**Exhibits O and P, Art. 11**)

29. Anthony Logiudice testified that Batrume was hired as a subcontractor by Carben to essentially run both Projects as it related to their scope of work.  Batrume was responsible for providing labor, a foreman/supervisor for each jobsite, responsible to determine which workers Batrume would use for each Project, and responsible for paying their own workers. (**Exhibit N**, **Logiudice Deposition, T31:4-24**)

30. Batrume is not a staffing agency company.  It is a concrete contractor. (**Exhibit Q, Browning Deposition, T26:10-13; Exhibit N, Logiudice Deposition, T28:12-14)(See Also, Exhibit R, Garrido Linkdin page describing himself as the Managing Partner for Batrume, a concrete contractor)**

31. Ronald Browning testified that for each Project, Carben paid Batrume on a weekly basis equal to the cost of Batrume's labor plus an additional 10% for profit and overhead.  Carben had no knowledge or control over how Batrume used those payments. (**Exhibit Q, Browning Deposition, T31:16-32:21; Exhibit S, Carben Payment Ledger to Batrume)**

**Facts Relevant to the Employees of Carben**

32. The only Carben company that had any employees during the course of the Water St. or Schermerhorn Projects was Carben Construction, Inc. (**See Declaration of Anthony Logiudice**)

33. Ronald Browning testified that, on advice of their accountant, Carben Industries effectively ceased operations  and all business was conducted by Carben Construction, Inc. by early 2019. (**Exhibit Q, Browning Deposition, T13:24-15:8**)

34. Aside from Anthony Logiudice and Ronald Browning, the principals, Carben Construction, Inc. had no employees from its inception in March of 2019 until April of

2019. (**Declaration** of **Anthony Logiudice**; **Exhibit T**, **Carben Construction, Inc. Payroll Report for April of 2019-January of 2020**)

35. The payroll report shows that none of the Plaintiffs were ever employed by Carben Construction, Inc., nor were any other individuals identified by Plaintiffs as having a role in hiring, supervising, or paying them. (**Exhibit T**, **Carben Construction, Inc. Payroll Report for April of 2019-January of 2020**)

**Facts Relevant to Plaintiffs' Joint Employer Claim**

36. In the Factual Background section of Plaintiffs' Complaint, Plaintiff alleges that Carben and County Wide were Joint Employers. Anthony Derasmo, County Wide's representative, testified that he had not heard of any of the Plaintiffs previously and had no idea whether any of them worked at the Water St. or Schermerhorn Projects. (**Exhibit U, Derasmo Dep. T66:4-24**)

37. No evidence was elicited in Mr. Derasmo's deposition that County Wide and Carben had any joint responsibility for hiring, firing, supervising, paying, or otherwise controlling each other's employees, or the Plaintiffs themselves.

38. Mr. Browning offered no testimony at his deposition, and no evidence was offered to suggest that County Wide and Carben had any joint responsibility for hiring, firing, supervising, paying, or otherwise controlling each other's employees, or the Plaintiffs themselves. (**Exhibit Q, Browning Dep.**)

39. Mr. Browning testified unequivocally that no Carben entity has ever employed any of the Plaintiffs. (**Exhibit Q, Browning Dep. T49:12-50:7**)

40. No evidence was elicited in the deposition of Anthony Logiudice that County Wide and Carben had any joint responsibility for hiring, firing, supervising, paying, or otherwise

controlling each other's employees, or the Plaintiffs' themselves. (**Exhibit N, Logiudice Dep.**)

41. No evidence was elicited in the deposition of any of the Plaintiffs' or their answers to interrogatories that County Wide and Carben had any joint responsibility for hiring, firing, supervising, paying, or otherwise controlling each other's employees, or the Plaintiffs' themselves. (**See Generally Exhibits for Plaintiffs' Depositions and Interrogatory Answers Cited Above**)

42. County Wide and Carben are distinct companies with no overlapping personnel.  They keep separate business records, insurance and payroll.  They do not share in the responsibility to hire, fire, pay, or supervise either of their respective employees.  This was true during the Water St. and Schermerhorn Projects and it remains true today. (**Declaration Of Anthony Logiudice**)

**Facts Specifically Germane to County Wide's Cross Claim against Carben**

43. The Indemnity Clause for the 120 Water St. and 70 Schemerhorn Projects between Carben and County Wide states in relevant part that Carben, to the fullest extent permitted by law, agrees to indemnify, defend and hold harmless County Wide for any "losses, claims, suits, damages", etc. "*directly or indirectly arising out of the negligent acts or omissions of the Sub-subcontractor [Carben], its sub-subcontractors at any tier and any persons for whose acts they may be responsible or alleged to arise out of or in connection with or as a consequence of the performance or non-performance of the Work of the Sub-Subcontractor or such Sub-Subcontractor's respective agents, subcontractors or employees pursuant to this Agreement [...].  Notwithstanding anything to the contrary contained herein, the obligations of Sub-Subcontractor pursuant to this Article shall not extend to liability of an*

14

*Indemnified Party for bodily injury or wrongful death to persons or damage to property attributable to an Indemnified Party's negligence or willful misconduct."* (**Exhibits L and M, Article 21.1**)

44. The Indemnity Clause in each contract only requires indemnification for **negligent** acts or omissions for those Carben is responsible or for **negligent** acts or omissions alleged to arise out of the performance or non-performance of the Work of the Sub-subcontract agreements between the parties. (**Id.**)

45. The Plaintiffs' complaint does not include any allegations of negligence and in fact, the words "negligent" or "negligence" do not even appear in Plaintiffs' complaint. (**Exhibit A, Plaintiff's Complaint**)

46. The Agreements between County Wide and Carben for the respective Projects do not require Carben to indemnify, defend or hold harmless County Wide for the types of claims and allegations contained in Plaintiffs' Complaint. (**Exhibits L and M, Article 21.1**)

47. The respective Contracts do not require Carben to indemnify County Wide for County Wide's own negligence, nor do the Contracts require Carben to indemnify County Wide for any of the types of claims raised in Plaintiffs' complaint. (**Id.**)

48. The "Work Force" clauses of the contracts, at Article 14, required Carben to assume sole liability for payment of any union benefits payable to employees of Carben or its subcontractors, and to indemnify County Wide from all claim and liability for payment of said union benefits. (**Exhibits L and M, Article 14.2**)

49. Plaintiffs have not alleged that they are a part of any union and there is no allegation of any failure to pay union benefits in this lawsuit. (**Exhibit A, Plaintiffs' Complaint**)

## LEGAL ARGUMENT

**I.**     **PLAINTIFFS HAVE NOT PRODUCED ANY EVIDENCE THAT THEY WERE EMPLOYEES OF CARBEN.**

For Plaintiffs to succeed on their claims against Carben, they must prove that Carben was an "employer" of the Plaintiffs or a "joint employer" (along with County Wide) of the Plaintiffs under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").  Despite this, no evidence has been discovered or adduced by the Plaintiffs that they were either directly employed by Carben, or indirectly employed through a joint employer relationship between Carben and County Wide.

Even though the FLSA and NYLL provide for a broad definition of what it means to be an employer (i.e., "any person acting directly or indirectly in the interest of an employer in relation to an employee"), certain facts must still be proven by Plaintiffs to establish this relationship. Morales v. Performance Master, Inc., 2022 U.S. Dist. LEXIS 93335, *4-5, 2022 WL 1645088 (**Attached hereto**), citing Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013); Carter v. Dutchess Comm. College, 735 F.2d 8, 12 (2d Cir. 1984).  The Courts employ an "economic realities" test to determine whether an employer-employee relationship exists.  The factors for this test include whether the employer 1) had the power to hire or fire the employees, 2) supervised and controlled employee work schedules or conditions of employment, 3) determined the rate and method of pay, and 4) maintained employment records. Id.

The undisputed facts of this case establish that none of these factors are present in this matter.  Each of the Plaintiffs testified (in deposition or through interrogatories) that they were employed by County Wide.  Each Plaintiff claimed to have been solely employed by County Wide, not Carben. (**Carben SOF #7;** **Exhibit 7, Gerardo Bautista Dep., T21:23-22:12, T22:20-23:9)**

16

(Carben SOF #8; **Exhibit D, Hugo Bautista Supp. Interrogatory Answers**) (Carben SOF #9;

**Exhibit E, Ovando Zepeda Dep., T9:19-10:4; T10:25-11:15, T20:8-10**) (Carben SOF #10;

**Exhibit F, Juan Zepeda Supp. Interrogatory Answers**) (Carben SOF #11; **Exhibit G,**

**Macatoma Supp. Interrogatory Answers**) (Carben SOF #12; **Exhibit H, Acuna Dep.**

**Transcript, T9:25-11:10**) (Carben SOF #13; **Exhibit I, Rojas Dep. T9:16-10:5**) (Carben SOF

#14; **Exhibit J, Rodriguez Dep., T9:11-25; T11:19-23; T12:8-15**) (Carben SOF #15; **Exhibit**

**K, Hernandez Supp. Interrogatory Answers**)

In addition, the Plaintiffs who appeared for depositions all testified that a Mr. Martin Peru

or a person named "Perucho" supervised them, determined their work hours, and/or was in charge

if issuing them payments for their work. (**Carben SOF #7; Exhibit 7, Gerardo Bautista Dep.,**

**T28:6-30:4**) (**Carben SOF #9; Exhibit E, Ovando Zepeda Dep., T11:23-12:4; 15:8-16;**

**T19:24-21:9**) (**Carben SOF #12; Exhibit H, Acuna Dep. Transcript, T12:17-24; T14:7-14,**

**T17:4-5**) (**Carben SOF #13; Exhibit I, Rojas Dep. T11:23-12:12; T15:13-14, T22:3-5**)

(**Carben SOF #14; Exhibit J, Rodriguez Dep., T15:21-16:17, T18:11-13, T21:11-12**)

Multiple Plaintiffs also testified that the allegation in their filed Complaint that they were

employed by Carben was false or incorrect. (**Carben SOF #7, Exhibit C, Gerardo Bautista**

**Dep., T36:18-22**) (**Carben SOF #9, (Exhibit E, Ovando Zepeda Dep., T22:17-24:10**)   The

deposition testimony and interrogatory answers of each of the Plaintiffs makes clear that none of

them were actually employed by Carben.  Moreover, as noted above, none of the Plaintiffs claimed

to have been employed by Carben's subcontractor, Batrume, either.  Carben's principals, Anthony

Loguidice and Ronald Browning, likewise confirmed that none of the Plaintiffs were employed by

Carben. (**Carben SOF #32, Declaration of Anthony Loguidice; Carben SOF #34, Exhibit T,**

**Carben Payroll Report for April 2019-January 2020**)

Plaintiffs' contention that Carben somehow employed Plaintiffs because Carben's subcontract agreement with County Wide required them to supply labor and materials to these Projects is unavailing.  First, it is undisputed that in fulfilling its contractual obligations to County Wide, Carben supplied materials for its scope of work and Carben hired Batrume to supply the labor for that scope of work.  (**Carben SOF #23, <u>Exhibit N</u>, Loguidice Deposition, T26:8-10, T34:22-35:23**)  Carben did not directly supply any labor to this Project.  Second, the Plaintiffs have not produced any evidence that they were actually employed by Batrume.  As noted above, each Plaintiff claims to have been employed by County Wide, not Carben or Batrume.  Even if there was an issue of fact about whether any of the Plaintiffs were employed by Batrume, this by itself is not enough to implicate Carben.  Third, the mere fact that Carben was contractually obligated to provide labor for its scope of work is not a material fact.  Carben did supply labor through its sub-subcontract agreement with Batrume, and no Plaintiff has claimed to have been employed by Batrume.

The simple truth is that Plaintiffs have not produced any evidence that Carben had the power or were in any way involved in the hiring or firing of Plaintiffs.  Plaintiffs have not produced any evidence that Carben supervised or controlled the Plaintiffs' work on these Projects.  Plaintiffs have produced no evidence that Carben had any involvement in the method or amount Plaintiffs' were paid, and Carben did not maintain any employment records related to the Plaintiffs.

The Plaintiffs have also failed to produce any evidence that they were employees of Carben under the test set forth in <u>Zheng</u>, infra.  In <u>Zheng v. Liberty Apparel Co.,</u> 355 F.3d. 61 (2nd Cir. 2003), the Court set forth six factors for evaluating one's employment status: 1) whether Carben's premises and equipment were used for Plaintiffs' work; 2) whether Carben had a business that could or did shift as one unit from one putative joint employer to another; 3) the extent to which

plaintiffs performed a discrete line-job that was integral to Carben's process of production; 4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; 5) the degree to which Carben supervised Plaintiffs' work; and 6) whether Plaintiffs worked exclusively or predominantly for Carben. Id. at 71-72.

Plaintiffs did not produce any evidence that they used any of Carben's materials or equipment.  In fact, Plaintiffs allege in their Complaint that they had to buy their own tools. **(Carben SOF, <u>Exhibit A</u>, Plaintiffs' Complaint, Count 7)**  Plaintiffs produced no evidence that Carben's business shifted as one unit from one employer to another.  Carben is a construction contractor typically engaging in concrete work. **(Carben SOF, <u>Exhibit N</u>, Loguidice Deposition, T12:15-20, T14:2-4)**  It is not a staffing agency.  Plaintiffs produced no evidence to satisfy the third prong of the <u>Zheng</u> test, since Plaintiffs do not claim they were line workers, they do not claim they were employed by Carben, and there is no evidence that Plaintiffs' work was integral to Carben's business.  Plaintiffs' produced no evidence that their work was passed from one subcontractor to another without material changes.  As noted, Plaintiffs do not claim to have been employed by Carben or its sub-subcontractor, Batrume.  Plaintiffs did not even establish that the scope of work they performed was within Carben or Batrume's scope.  Plaintiffs produced no evidence that Carben supervised any of the Plaintiffs' work, and Plaintiffs' produced no evidence that they worked exclusively or predominantly for Carben.  In fact, as discussed in detail above, the Plaintiffs, to a man, claim to have been employed solely by County Wide.  The Plaintiffs did not claim any sort of relationship with Carben and in fact testified that they knew nothing of Carben's business at all.

None of the factors for determining employment, as set forth by <u>Morales</u>, <u>Carter,</u> or <u>Zheng</u>, supra. have been established by the Plaintiffs.  By any measure, the Plaintiffs' have not put forth

any evidence that they were employed by Carben. <u>See</u> <u>Yi Mei Ke v. J R Sushi 2 Inc</u>., 2022 U.S. Dist. LEXIS 22776, 2022 WL 1496576 (**Attached hereto**) Plaintiffs' case for employment by Carben is based solely on the fact that Carben contracted to perform work on the same Projects that Plaintiffs' allege to have worked, nothing more.  Beyond that, the Plaintiffs specifically denied in discovery that they were employed by Carben, and they have not produced or even alleged any facts that would fall under the rubric of any of the factors for "employment" set forth in <u>Carter</u> or <u>Zheng</u>.

For these reasons, Carben is entitled to Summary Judgment dismissing all claims by Plaintiffs that Carben was a direct employer of said Plaintiffs.

II.     **<u>PLAINTIFFS HAVE NOT PRODUCED ANY EVIDENCE THAT CARBEN AND COUNTY WIDE ACTED AS JOINT EMPLOYERS.</u>**

Plaintiffs' Complaint alleges a joint employer relationship between Carben and County Wide.  As noted above, it is undisputed that Carben did not directly employ any of the Plaintiffs, and as discussed below, there is no evidence that Carben and County Wide were joint employers of the Plaintiffs.

In order to determine whether a joint employer relationship exists between Carben and County Wide, there are several factors that must be considered, including: the party's right to control the manner and means by which the product/job is accomplished, the skill required, the source of the tools, the location of the work, the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party, the extent of the hired party's discretion over when and how long to work, the method of payment, the hired party's role in hiring and paying assistants, whether the work is part of the regular business of the hiring party, whether the hiring party is in the business, the provision of employee benefits, and

the tax treatment of the hired party. <u>Felder v. United States Tennis Ass'n</u>, 27 F.4th 834, 843-844, 2022 U.S. App. LEXIS 5848, *15-17. "Broadly, these factors examine whether the alleged employer 'paid the employees' salaries, hired and fired them, and had control over their daily employment activities." <u>Id.</u> The "crux" of these factors is "the element of control." <u>Id.</u> Ultimately, a joint employer relationship only exists when "two or more entities, according to common law principals, share significant control of the same employee(s)." <u>Id.</u>

None of these factors are present in this case and the Plaintiffs have not produced or even claimed any facts indicating otherwise. As discussed above, Plaintiffs have not produced any evidence that Carben had any control over the manner in which their work was accomplished, the source of their tools, or location of their work. Plaintiffs testified that an individual who was not employed by Carben (Martin Peru or Perucho) was their supervisor. Plaintiffs have not alleged that anyone from Carben assigned them any work (or had the authority to do same), controlled their hours of work, or their method of payment. Plaintiffs produced no evidence that would satisfy any of the factors for joint employment as set forth in <u>Felder</u>. And just as in <u>Felder</u>, all parties, including every Plaintiff, agrees that Carben was not a direct employer of any of the Plaintiffs. <u>Id.</u> at 842.

The core of analyzing the joint employer doctrine is the level of control asserted by an alleged employer over a plaintiff, and whether two or more entities, according to common law principles, shared significant control over the same employee. <u>Id.</u> at 843. To that end, Carben and County Wide are two separate and distinct companies with no overlapping personnel. (**Carben SOF #36-42; Declaration of Anthony Loguidice, pars. 10-12)** They maintain separate business/employment records. They do not have any authority to hire, fire, or otherwise supervise

each other's employees in any respect. (**Id.**) This fact was not disputed by the Plaintiffs. (**Carben SOF #42 and Plaintiffs' Response**)

Further, in response to Carben's Rule 56.1 Statement of Material Facts, Plaintiffs did not dispute that Mr. Derasmo (County Wide's representative) had never heard of the Plaintiffs and had no idea whether they worked on either of the Projects. When presented with the factual statement that no testimony was elicited from the representatives of Carben or County Wide that the companies had any joint responsibility for hiring, firing, supervising, paying, or otherwise controlling each other's employees, or the Plaintiffs themselves, the Plaintiffs could not come up with a specific fact in the record to dispute this statement. (**Carben SOF #36-42**)

With specific respect to Carben's Statement of Fact that "No evidence was elicited from Mr. Derasmo's deposition that County Wide and Carben had any joint responsibility for hiring, firing, supervising, paying, or otherwise controlling each other's employees or the Plaintiffs themselves," Plaintiffs claimed that this fact was disputed by Mr. Derasmo's deposition testimony at T27:18-21. That portion of Mr. Derasmo's testimony reads as follows:

> Q.      *Again, you have to forgive my I (sic) ignorance, when you say everything, can you list what everything entails?*
>
> A.      *The material, the labor.*

**(Carben SOF, <u>Exhibit U</u>, Derasmo Dep., T27:18-21)**

To give context, this testimony was actually offered in response to questions about the nature of the contract between the Rinaldi Group and County Wide on the 120 Water St. Project. Not only was the testimony unrelated to Carben, but it had nothing to do with Carben and County Wide sharing any responsibility over the Plaintiffs' alleged work on the Projects.

What is more, the allegation that Ronald Browning went to County Wide's office to purchase ID badges for one of the Projects is immaterial and unfounded. First, even when viewing the badge issue in a light most favorable to Plaintiff, this disputed fact is immaterial because Mr. Derasmo, who first levied the allegation, testified that he did not know the names of the individuals for whom Mr. Browning purchased the badges, he did not know who would be issued a badge, and he did not know how many badges Mr. Browning may have purchased. (**Exhibit U, Derasmo Dep. T55:7-24; T60:7-10**) Thus, even if the Court accepted Mr. Derasmo's testimony that Mr. Browning used his own credit card to purchase ID badges for one of the Projects, there is no evidence that Mr. Browning purchased ID badges for any of the Plaintiffs. Second, this allegation is disputed by the testimony of Ronald Browning, who says he never purchased the ID badges, and Mr. Browning was able to explain in detail how the process for obtaining the ID badges goes through the Prime Contractor, Noble Construction. (**Exhibit Q, Browning Dep., T36:14-37:21**) While Carben submits that no reasonable juror could possibly believe Anthony Derasmo's vague and unsubstantiated testimony on this issue, the factual allegation is immaterial because there remains no evidence that Mr. Browning purchased ID badges for any of the Plaintiffs.

The simple truth is that Plaintiffs have not elicited any deposition testimony or produced any other form of evidence that Carben and County Wide shared any joint responsibility over their own employees or Plaintiffs themselves. Carben and County Wide simply had a contractor-subcontractor relationship. If Plaintiffs' allegations of a joint employer relationship are accepted in this case, it will stretch the meaning of the "joint employer" doctrine to absurdity and effectively nullify the contractor-subcontractor contractual relationship.

For these reasons, any claim by Plaintiffs that Carben and County Wide were "joint employers" should be summarily dismissed.

III.   **COUNTY WIDE'S CROSS CLAIM FOR INDEMNIFICATION MUST BE DISMISSED AS A MATTER OF LAW.**

County Wide's cross claims are all based on a theory of common law and/or contractual indemnification.  First, it is settled that there is no right to contribution or indemnification for any employer found liable under the FLSA or NYLL. Herman v. RSR Sec. Servs., 172 F.3d 132, 144 (2d. Cir. 1999).  Gustafson v. Bell Atl. Corp., 171 F. Supp. 2d 311, 328 (NYSD 2001).  For County Wide to be entitled to indemnification, County Wide must show that it delegated exclusive responsibility for the duties giving rise to Plaintiffs' loss to Carben and that County Wide has not committed any wrongdoing on its own. Bd. of Mgrs. of Olive Park Condo. v. Maspeth Props., LLC, 170 A.D.3d 645, 647, 95 N.Y.S.3d 344, 346, 2019 N.Y. App. Div. LEXIS 1595, *4, 2019 NY Slip Op 01554, 2, 2019 WL 1051897 (**Attached hereto**).  The simple fact that no Plaintiff has claimed that anyone from Carben had any authority/control over them in any sense, and the fact that each Plaintiff claims they were solely employed by County Wide, precludes County Wide's indemnification claims.

Contractually, indemnification is only required for "negligent acts or omissions" on the part of Carben. (**Carben SOF #43, Exhibits L and M, Article 21.2**)  Plaintiffs' complaint does not allege "negligence" in any form or fashion (**Carben SOF #45, Exhibit A**), and the indemnification clauses contained in the Carben-County Wide contracts for these Projects do not call for indemnification of FLSA or NYLL claims.  Indeed, such a broad form of indemnification would be against public policy in any case.  See Gustafson, supra.

Finally, no evidence has been produced in this case that attributes liability to Carben in any way, let alone liability for any "negligent acts or omissions" as delineated in the indemnification

clause.  (**Carben SOF #43, <u>Exhibits L and M</u>, Article 21.2)**  Since Carben is not liable to the

Plaintiffs in any way, it cannot be held liable to County Wide under the theory of indemnification.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs' Complaint, and the Cross Claims asserted by

County Wide, should be dismissed with prejudice as against Carben Industries, Inc., Carben

Construction, Inc., Carben Concrete, Inc., Anthony Loguidice and Ronald Browning.

Dated:  September 8, 2022

                          _____

                          Matthew Lakind, Esq.
                          *Counsel for Carben Industries, Inc., Carben*
                          *Construction, Inc., Carben Concrete, Inc.,*
                          *Anthony Loguidice and Ronald Browning*

                          TESSER & COHEN, P.C.
                          946 Main St.
                          Hackensack, NJ 07601
                          201-343-1100



**User Name:** Maya Stanislawski
**Date and Time:** Tuesday, September 6, 2022 3:34:00 PM EDT
**Job Number:** 178855060

## Document (1)

1. *Bd. of Mgrs. of Olive Park Condo. v. Maspeth Props., LLC, 170 A.D.3d 645*
   **Client/Matter:** -None-
   **Search Terms:** Bd. of Mgrs. of Olive Park Condo. v. Maspeth Props., LLC, 170 A.D.3d 645
   **Search Type:** Natural Language

 Neutral
As of: September 6, 2022 7:34 PM Z

# Bd. of Mgrs. of Olive Park Condo. v. Maspeth Props., LLC

Supreme Court of New York, Appellate Division, Second Department

March 6, 2019, Decided

2017-06140

## Reporter

170 A.D.3d 645 *; 95 N.Y.S.3d 344 **; 2019 N.Y. App. Div. LEXIS 1595 ***; 2019 NY Slip Op 01554 ****; 2019 WL 1051897

 [****1]  Board of Managers of Olive Park Condominium, on its Own Behalf and on Behalf of Individual Unit Owners, Plaintiff, v Maspeth Properties, LLC, et al., Defendants/Third-Party Plaintiffs-Appellant, and Aron Deutsch, Appellant, et al., Defendants. TSF Engineering, P.C., et al., Third-Party Defendants-Respondents, et al., Third-Party Defendants.(Index No. 502349/13)

**Prior History:** *Board of Mgrs. of Olive Park Condominium v Maspeth Props. LLC, 2014 NY Misc LEXIS 5077, 2014 NY Slip Op 33012(U) (N.Y. Sup. Ct., Oct. 27, 2014)*

## Core Terms

third-party, indemnification, common-law, cause of action, condominium, individual unit, separate motion, inter alia, fault, contractual obligation, contractual, wrongdoing, vicarious, damages, motions, hired

## Case Summary

### Overview

HOLDINGS: [1]-Third-party plaintiffs were not entitled to common-law indemnification, in connection with allegedly deficient construction of condominium units, because the complaint alleged that third-party plaintiffs retained certain contractual responsibilities regarding the project and that any recovery against them would be based on their own failure to uphold those responsibilities.

### Outcome

Appeal dismissed. Order affirmed.

## LexisNexis® Headnotes

Torts > ... > Multiple Defendants > Indemnity > Noncontractual Indemnity

### HN1[⚓] Indemnity, Noncontractual Indemnity

The principle of common-law, or implied, indemnification permits one who has been compelled to pay for the wrong of another to recover from the wrongdoer the damages it paid to the injured party. The party seeking indemnification must have delegated exclusive responsibility for the duties giving rise to the loss to the party from whom indemnification is sought, and must not have committed actual wrongdoing itself.

Torts > ... > Multiple Defendants > Indemnity > Noncontractual Indemnity

### HN2[⚓] Indemnity, Noncontractual Indemnity

Common-law indemnification is warranted where a defendant's role in causing the plaintiff's injury is solely passive, and thus its liability is purely vicarious. Since the predicate of common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that a party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine.

## Headnotes/Summary

### Headnotes

Indemnity—When Claim for Indemnification Available—Implied Indemnification

170 A.D.3d 645, *645; 95 N.Y.S.3d 344, **344; 2019 N.Y. App. Div. LEXIS 1595, ***1595; 2019 NY Slip Op 01554, ****1

**Counsel:** [***1] Berg & David, PLLC, Brooklyn, NY (Abraham David of counsel), for defendants third-party plaintiffs-appellants and defendant-appellant.

Michael C. Tromello, Melville, NY (Jonathan P. Pirog of counsel), for third-party defendant-respondent TSF Engineering, P.C.

Ahmuty, Demers & McManus, Albertson, NY (Nicholas M. Cardascia and Glenn A. Kaminska of counsel), for third-party defendant-respondent Security Sheild, Inc.

**Judges:** LEONARD B. AUSTIN, J.P., SYLVIA O. HINDS-RADIX, JOSEPH J. MALTESE, LINDA CHRISTOPHER, JJ. AUSTIN, J.P., HINDS-RADIX, MALTESE and CHRISTOPHER, JJ., concur.

## Opinion

[*645] [**345] In an action, inter alia, to recover damages for breach of contract, the defendants third-party plaintiffs and the defendant Aron Deutsch appeal from an order of the Supreme Court, Kings County (Karen B. Rothenberg, J.), dated March 27, 2017. The order, insofar as appealed from, granted those branches of [*646] the separate motions of the third-party defendants TSF Engineering, P.C., and Security Shield, Inc., which were pursuant to *CPLR 3211 (a)* to dismiss the third-party cause of action for common-law indemnification insofar as asserted against each of them.

Ordered that the appeal by the defendant Aron Deutsch is dismissed, as [***2] he is not aggrieved by the order appealed from (*see CPLR 5511; Mixon v TBV, Inc., 76 AD3d 144, 156-157, 904 NYS2d 132 [2010]*); and it is further,

Ordered that the order is affirmed insofar as appealed from by the defendants third-party plaintiffs; and it is further,

Ordered that one bill of costs is awarded to the third-party defendants- respondents.

The plaintiff, the Board of Managers of Olive Park Condominium, on behalf of itself and individual unit owners, commenced this action to recover damages arising from the allegedly deficient construction of its condominium building and individual units. The defendants include, among others, Maspeth Properties, LLC, the sponsor of the condominium development (hereinafter Maspeth), and Superior Construction

Management, Inc., the general contractor (hereinafter [****2] Superior). The complaint alleged, inter alia, that Maspeth and Superior breached their contractual obligations to the plaintiff under the Offering Plan and Purchase Agreements for the individual units, inter alia, by failing to correct defects which were their fault and/or the fault of their subcontractors.

Maspeth and Superior commenced a third-party action for contractual and common-law indemnification against, among others, TSF Engineering, P.C. (hereinafter [***3] TSF), and Security Shield, Inc. (hereinafter Security). TSF was hired by Superior to, among other things, redesign the mechanical, plumbing, and electrical systems [**346] at the condominium building. Security was hired by Superior to install a Unitone Intercom System, a telephone network, CATV, and camera and card access systems at the condominium building. In a prior order dated October 27, 2014, the Supreme Court, in relevant part, dismissed the negligence causes of action against Maspeth and Superior on the ground that the plaintiff did not allege a duty owed to it which was independent of those contractual obligations.

TSF and Security separately moved pursuant to *CPLR 3211 (a)* to dismiss the amended third-party complaint and all cross claims insofar as asserted against each of them. In an order dated March 27, 2017, the Supreme Court granted the motions. Maspeth and Superior appeal from so much of the order as granted those branches of the separate motions which were [*647] to dismiss the third-party cause of action for common-law indemnification insofar as asserted against TSF and Security.

We agree with the Supreme Court's determination to grant those branches of the separate motions which were pursuant [***4] to *CPLR 3211 (a)* to dismiss the third-party cause of action for common-law indemnification insofar as asserted against TSF and Security. *HN1*[⬆] "'The principle of common-law, or implied, indemnification permits one who has been compelled to pay for the wrong of another to recover from the wrongdoer the damages it paid to the injured party'" (*Board of Mgrs. of the 125 N. 10th Condominium v 125North10, LLC, 150 AD3d 1063, 1064, 55 NYS3d 374 [2017]*, quoting *Curreri v Heritage Prop. Inv. Trust, Inc., 48 AD3d 505, 507, 852 NYS2d 278 [2008]*). "The party seeking indemnification 'must have delegated exclusive responsibility for the duties giving rise to the loss to the party from whom indemnification is sought,' and must not have committed actual wrongdoing itself"

170 A.D.3d 645, *647; 95 N.Y.S.3d 344, **346; 2019 N.Y. App. Div. LEXIS 1595, ***4; 2019 NY Slip Op 01554, ****2

(*Tiffany at Westbury Condominium v Marelli Dev. Corp., 40 AD3d 1073, 1077, 840 NYS2d 74 [2007]*, quoting *17 Vista Fee Assoc. v Teachers Ins. & Annuity Assn. of Am., 259 AD2d 75, 80, 693 NYS2d 554 [1999]*). *HN2*[⬆] "Common-law indemnification is warranted where a defendant's role in causing the plaintiff's injury is solely passive, and thus its liability is purely vicarious" (*Balladares v Southgate Owners Corp., 40 AD3d 667, 671, 835 NYS2d 693 [2007]*; *see Dreyfus v MPCC Corp., 124 AD3d 830, 830, 3 NYS3d 365 [2015]*). "Since the predicate of common-law indemnity is vicarious liability without actual fault on the part of the proposed indemnitee, it follows that a party who has itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine" (*Desena v North Shore Hebrew Academy, 119 AD3d 631, 635, 989 NYS2d 505 [2014]* [internal quotation marks omitted]).

The allegations in the complaint are that Maspeth and Superior retained certain contractual **[***5]** responsibilities regarding the project and that any recovery against them would be based on their own failure to uphold those responsibilities. This is not a case where a defendant's liability sounded in tort, and the tortious conduct may have been solely the result of a third-party defendant's negligence (*see Roach v AVR Realty Co., LLC, 41 AD3d 821, 839 NYS2d 173 [2007]*; *Baratta v Home Depot USA, 303 AD2d 434, 756 NYS2d 605 [2003]*).

Accordingly, we agree with the Supreme Court's determination granting those branches of the motions which were to dismiss the common-law indemnification cause of action insofar as asserted against TSF and Security (*see Board of Mgrs. of the 125 N. 10th Condominium v 125North10, LLC, 150 AD3d at 1064-1065*; **[**347]   [*648]** *American Ins. Co. v Schnall, 134 AD3d 746, 749-750, 22 NYS3d 92 [2015]*; *see also Dreyfus v MPCC Corp., 124 AD3d at 831*; *Torres v 63 Perry Realty, LLC, 123 AD3d 911, 912, 1 NYS3d 142 [2014]*; *Nesterczuk v Goldin Mgt., Inc., 77 AD3d 800, 805, 911 NYS2d 367 [2010]*). Austin, J.P., Hinds-Radix, Maltese and Christopher, JJ., concur.

---

**End of Document**



**User Name:** Maya Stanislawski
**Date and Time:** Tuesday, September 6, 2022 3:32:00 PM EDT
**Job Number:** 178854831

## Document (1)

1. *Morales v. Performance Master, Inc., 2022 U.S. Dist. LEXIS 93335*
   **Client/Matter:** -None-
   **Search Terms:** Morales v. Performance Master, Inc., 2022 U.S. Dist. LEXIS 93335
   **Search Type:** Natural Language

No *Shepard's* Signal™
As of: September 6, 2022 7:32 PM Z

## *Morales v. Performance Master, Inc.*

United States District Court for the Southern District of New York

May 24, 2022, Decided; May 24, 2022, Filed

21 Civ. 97 (ER)

### Reporter
2022 U.S. Dist. LEXIS 93335 *; 2022 WL 1645088

ISRAEL CAMEY MORALES, HECTOR MARTINEZ, LUIS MAURAT, ISAIAS NOE HERRERA, RIGOBERTO ALFARO, ANGEL ARANA, ALBERTO MORALES, CARLOS GUARDODA, GONZALO CORDOBA, and SAUL REYES RAMOS, Plaintiffs, — against — PERFORMANCE MASTER, INC., FIVE HORSEMEN CONSTRUCTION INC., FIVE HORSEMEN LLC, J.D.M. MARMOL & GRANITE CORP., RONALD CHIEN, JOAH SAMUEL, DORREL COUSINS, LESLIE REID, DAVID ALLEN, MARCUS ZHIMINAICELA, and ANGEL ZHIMINAICELA, Defendants.

## Core Terms

motion to dismiss, job site, allegations, wages

**Counsel:** **[*1]** For Israel Camey Morales, individually, Israel Camey Morales, on behalf of all others similarly situated, Hector Martinez, individually, Hector Martinez, on behalf of all others similarly situated, Isaias Noe Herrera, individually, Isaias Noe Herrera, on behalf of all others similarly situated, Rigoberto Alfaro, individually, Rigoberto Alfaro, on behalf of all others similarly situated, Angel Arana, individually, Angel Arana, on behalf of all others similarly situated, Alberto Morales, individually, Alberto Morales, on behalf of all others similarly situated, Carlos Guardoda, individually, Carlos Guardoda, on behalf of all others similarly situated, Gonzalo Cordoba, individually, Gonzalo Cordoba, on behalf of all others similarly situated, Saul Reyes Ramos, individually, Saul Reyes Ramos, on behalf of all others similarly situated, Luis Maurat, individually, Luis Maurat, on behalf of all others similarly situated, Plaintiffs: Roman Mikhail Avshalumov, NY, Kew Gardens, NY.

For Five Horsemen Construction Inc., Five Horsemen LLC, Ronald Chien, as an individual, Defendants: John K. Diviney, Rivkin Radler, LLP, Uniondale, NY; Keegan Benoit Sapp, Lawrence S. Han, Rivkin Radler LLP (Uniondale), **[*2]** Uniondale, NY.

**Judges:** Edgardo Ramos, United States District Judge.

**Opinion by:** Edgardo Ramos

## Opinion

### OPINION & ORDER

Ramos, D.J.:

Plaintiffs filed this action on January 6, 2021, alleging that defendants had violated state and federal wage and hour laws while plaintiffs were employed by them. Doc. 1; Doc. 49. Defendant Joah Samuel filed a motion to dismiss the amended complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to state a claim on January 19, 2022. Doc. 59. For the reasons set forth below, the motion to dismiss is DENIED.

### I. BACKGROUND

The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g., Koch v. Christie's Int'l PLC, 699 F. 3d 141, 145 (2d Cir. 2012)*.

Plaintiffs are a group of workers who were employed by defendants at various times between November 2018 and March 2020, at a construction site on East 22nd Street in Manhattan. Second Amended Complaint, Doc. 49 ¶¶ 7-18. Five Horsemen was the contractor on the job site, and Performance Master and J.D.M. Marmol were subcontractors. *Id.* ¶¶ 19-22.

Joah Samuel worked for Five Horsemen as a construction manager. Samuel Dec. in Sup., Doc. 60 at 2. He was present at the job site multiple times a week to observe the project's progress, direct the workers as **[*3]** to their tasks, give them required tools,

determine their hours and when they could stop working, and distribute their wages. Doc. 49 ¶¶ 97-103. He also was empowered to make decisions regarding their employment. *Id.* ¶ 101. In short, he was "in charge of [the] projects, including supervising the workers and/or subcontractors at the job site." *Id.* ¶ 102.

Plaintiffs filed suit as a collective class, alleging that the defendants subjected them to work weeks of over 40 hours without any overtime compensation or notice or record of their work, and lower-than-minimum wages, in violation of the federal *Fair Labor Standards Act ("FLSA")* and New York Labor Law ("NYLL"). *Id.* ¶¶ 168-69, 179-206. Defendant Samuel filed the instant motion to dismiss him as a defendant, claiming that the lawsuit "does not apply to [him] as [he] never hired these workers," and that he had "no involvement with payroll or paying workers." Doc. 60 at 2.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Christie's Int'l PLC, 699 F.3d at 145.* However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of [*4] the elements of a cause of action." *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*); *see also id. at 681* (citing *Twombly, 550 U.S. at 551*). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id. at 678* (quoting *Twombly, 550 U.S. at 570*). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556*). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly, 550 U.S. at 570.*

## III. DISCUSSION

Samuel argues that he was not the plaintiffs' employer and is therefore not liable for their claims. The FLSA provides a broad definition of what it means to be an employer. It includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." *29 U.S.C. § 203; see also Remache v. Mac Hudson Grp., 2018 U.S. Dist. LEXIS 154099, *10-*11 (E.D.N.Y. 2018)* (endorsing this broad employer definition in a similar construction context). The "statutory standard for employer status under the NYLL is nearly identical to that of the FLSA," [*5] and courts in this district "apply the [same] analysis to both statutes." *Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013).*

Therefore, the question is whether plaintiffs allege sufficient facts to state a plausible claim that Samuel was, in fact, their employer. The Court finds that they do. The Supreme Court's precedent has made clear that the employer-employee relationship is an economic one, and that "economic reality" is what drives designation as an employer. *Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961).* To determine whether a particular individual is an employer pursuant to the economic reality test for purposes of both the FLSA and NYLL, courts must consider the totality of the circumstances, and may depend on non-exhaustive factors including "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Guerra v. Trece Corp., 2020 U.S. Dist. LEXIS 223309, *21 n.10 (S.D.N.Y. 2020)* (citing *Carter v. Dutchess Comm. College, 735 F.2d 8, 12 (2d Cir. 1984)*).

Plaintiffs allege sufficient facts to support the finding that, under this economic reality test, Samuel was an employer.

With regards to the first *Carter* factor, the complaint alleges that plaintiffs were told that employment-related decisions at the job site were made by Samuel. [*6] Doc. 49 ¶ 101. So, taking plaintiffs' allegations as true, Samuel had the power to fire the employees. This ability to fire is an element of control of a worksite, and this would be the case even if it were also true that he "never hired these workers," as he alleges. Doc. 60 at 2.;*see also Goldberg, 366 U.S. at 33* (finding control over employment because "the management can expel [workers] for substandard work").

Samuel also directly supervised the employees. He was "present on the job site" several times a week, and told the workers what tasks to do and what tools to use.

2022 U.S. Dist. LEXIS 93335, *6

Doc. 49 ¶¶ 97-99; *see also Guerra, 2020 U.S. Dist. LEXIS at *28* (finding that going "to the [place of work] several times per week to assess [work conditions] weigh[ed] in favor of . . . status as an employer"). He also told them when they could stop working each day, which necessarily implies that he controlled their schedules and conditions of employment. *Id.* ¶¶ 100-01.

While no facts are alleged that indicate that Samuel set the wages of the employees, he "would deliver and distribute" the wages to the plaintiffs at the work site, so was involved with the method of payment in line with the third factor. *Id.* ¶ 103; *see also Guerra, 2020 U.S. Dist. LEXIS at *47* (finding defendant to have met this factor because **[*7]** he processed payments and would "distribute . . . payments" even though he did not calculate their amounts). No facts are alleged regarding the fourth factor, related to the maintenance of employment records, besides the conclusory statement that he "maintains employment records." Doc. 49 ¶ 96. Nonetheless, at least three of these factors are therefore clearly met, and "that th[e] fourth factor is not met is not dispositive." *Herman v. RSR Sec. Servs., 172 F.3d 132, 140 (2d Cir. 1999)* (citing *Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988)*).

Moving to a broader totality-of-the-circumstances analysis, the Court finds the plaintiffs allege sufficient facts to plausibly establish that Samuel was an employer for the purposes of the FLSA and NYLL. First, as plaintiffs point out, defendant concedes in his motion to dismiss that, as a "construction manager," he oversaw all day-to-day job site operations. Doc. 60 at 2. That Samuel admits to the "actual exercise of control" is a strong indication that he does fall under the FLSA and NYLL's broad definition of employer. *Ocampo v. 455 Hospitality LLC, 2021 U.S. Dist. LEXIS 178875, *18 (S.D.N.Y. 2021)*.

Second, plaintiffs sufficiently allege that Samuel was acting in the interest of Five Horsemen. Five Horsemen was the site's general contractor, and Samuel's presence on site to supervise the project was presumptively in the interest **[*8]** of that company. Doc. 49 ¶¶ 19, 97. His disbursement of the wages owed plaintiffs was clearly in the interest of Five Horsemen as well. *Id.* ¶ 103. Thus, considering the totality of the circumstances, the complaint sufficiently alleges that Samuel was an employer for the purposes of the FLSA and NYLL. While he may not have personally hired the plaintiffs, he controlled the conditions of employment in that he determined the work they performed and when they performed it, and when and how they were paid for

doing so. Accordingly, Samuel's claim must be denied.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is DENIED as to the claims against Joah Samuel. The Clerk of Court is respectfully directed to terminate the motion, Doc. 59, and to mail a copy of this order to Joah Samuel.

It is SO ORDERED.

Dated: May 24, 2022

New York, New York

/s/ Edgardo Ramos

Edgardo Ramos, U.S.D.J.

**End of Document**



**User Name:** Maya Stanislawski
**Date and Time:** Tuesday, September 6, 2022 3:33:00 PM EDT
**Job Number:** 178854973

## Document (1)

1. *Yi Mei Ke v. J R Sushi 2 Inc., 2022 U.S. Dist. LEXIS 22776*

    **Client/Matter:** -None-
    **Search Terms:** Yi Mei Ke v. J R Sushi 2 Inc., 2022 U.S. Dist. LEXIS 22776
    **Search Type:** Natural Language

 Positive
As of: September 6, 2022 7:33 PM Z

## *Yi Mei Ke v. J R Sushi 2 Inc.*

United States District Court for the Southern District of New York

February 7, 2022, Decided; February 7, 2022, Filed

19-CV-7332 (PAE) (BCM)

**Reporter**
2022 U.S. Dist. LEXIS 22776 *; 2022 WL 1496576

YI MEI KE, Plaintiff, -against- J R SUSHI 2 INC., et al., Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, Summary judgment denied by, As moot *Yi Mei Ke v. 2 Inc., 2022 U.S. Dist. LEXIS 55837 (S.D.N.Y., Mar. 28, 2022)*

**Prior History:** *Yi Mei Ke v. JR Sushi 2 Inc., 2021 U.S. Dist. LEXIS 8045, 2021 WL 148751 (S.D.N.Y., Jan. 15, 2021)*

## Core Terms

sanctions, Troy Law, summary judgment, Defendants', boss, deposition, declaration, supervised, parties, costs, material fact, plaintiff's claim, work schedule, meritless, email, hire, employment condition, bad faith, non-moving, restaurant, undisputed, discovery, drop, deposition testimony, employment record, attorney's fees, daughter, cross-motion, misconduct, pre-motion

**Counsel:** [*1] For Yi Mei Ke, on behalf of herself and others similarly situated, also known as Yimei Ke, Plaintiff: Aaron B. Schweitzer, John Troy, Troy Law, PLLC, Flushing, NY.

For J R Sushi 2 Inc, doing business as, JR Sushi 2, Kai Tuan Wang, Xin Wang, Defendants: Yi Lin, Law Office of YI Lin, New York, NY.

For Famous Sichuan New York Inc, doing business as, Famous Sichuan, Rui Yang, also known as, Ruifeng Yang, also known as, Rui Feng Yang, also known as, Jane Doe, Zinn Wang, also known as, Zi Wang, also known as, John Doe, Defendants: Benjamin B. Xue, LEAD ATTORNEY, Michael Steven Romero, Xue & Associates, P.C., Glen Cove, NY.

**Judges:** BARBARA MOSES, United States Magistrate Judge.

**Opinion by:** BARBARA MOSES

## Opinion

### REPORT AND RECOMMENDATION TO THE HONORABLE PAUL A. ENGELMAYER

**BARBARA MOSES, United States Magistrate Judge**.

Plaintiff Yi Mei Ke worked as a kitchen helper and cook at the JR Sushi 2 restaurant (JR Sushi), located at 86A West Broadway in Manhattan. Am. Compl. (Dkt. No. 31) ¶ 65. In this action, brought on behalf of herself and others similarly situated, plaintiff sued two corporate defendants and six individuals, alleging that they were all "shareholders, directors, officers, and/or managers" of JR Sushi (and another [*2] restaurant, called Famous Sichuan); that they were all her joint employers; and that they all violated the minimum wage and overtime provisions of the *Fair Labor Standards Act (FLSA)*, as well as the minimum wage, overtime, spread-of-hours, wage notice, and wage statement provisions of the New York Labor Law (NYLL) and its implementing regulations. Am. Compl. ¶¶ 22, 24-31, 33-37, 39-41, 43-45, 47.

Both corporate defendants and four of the six individual defendants have appeared and answered. The four individuals are a family: Ruifeng Yang, who owns JR Sushi; her husband Kai Tuan Wang, the "general on-site manager" of JR Sushi; their son Zi Wang; and their daughter Xin Wang. Am. Compl. ¶¶ 26-43. Zi Wang has consistently maintained that he was never an owner or manager of JR Sushi; rather, during plaintiff's employment, he was a full-time college student. Declaration of Zi Wang (Zi Wang Decl.) (Dkt. No. 136) ¶¶ 3-7. Similarly, Xin Wang has consistently maintained that she was never an owner or manager of the restaurant. Declaration of Xin Wang (Xin Wang Decl.)

(Dkt. No. 137) ¶¶ 6-9. Rather, throughout plaintiff's employment, Xin Wang was a full-time schoolteacher. *Id.* ¶ 5.

At deposition on March 31, 2021, testifying **[*3]** through a Chinese interpreter, plaintiff confirmed that it was Kai Tuan Wang (whom she called "boss"), not his children, who hired her, supervised her, paid her wages, decided whether to give her a raise, and kept her employment records. Declaration of Benjamin B. Xue (Xue Decl.) (Dkt. No 135) Ex. F. (Ke Dep. Tr.) (Dkt. No. 135-6), at 33-36, 64, 79-80. She saw Zi Wang from time on weekends, when he came in, at his father's direction, to work a Saturday or Sunday shift as a waiter. *Id.* at 80. She saw Zi's sister Xin Wang a total of "[m]aybe three times," when her parents "felt there was a need to adjust the prices" and "would tell their daughter to come and make the adjustments" on the computer. *Id.* at 59, 83. Ke was not "aware" that she had sued Zi Wang and Xin Wang, *id.* at 81, and believed she was "only suing two, the boss and the boss' wife." *Id.* at 82. Plaintiff testified that she had "no right to sue Zi Wang," *id.*, and "no reason whatsoever to sue Xin Wang." *Id.* at 84.

Thereafter, the parties agreed that all claims against Zi and Xin Wang should be dismissed. However, plaintiff, through her counsel Troy Law, PLLC (Troy Law), refused to dismiss those claims with prejudice, as defendants **[*4]** requested, offering instead to "drop" Zi and Xin Wang without prejudice pursuant to *Fed. R. Civ. P. 21*, or dismiss the claims against them, also without prejudice, pursuant to *Fed. R. Civ. P. 41(a)(1)(A)(ii)*. *See* Pl. Letter dated May 6, 2021 (Dkt. No. 131) at 1; Declaration of John Troy (Troy Decl.) (Dkt. No. 140) ¶¶ 22-24 & Exs. 6-9 (Dkt. Nos.140-6 through 140-9); Xue Decl. ¶ 15 & Exs. I & J (Dkt. Nos. 135-9, 135-10). Zi and Xin Wang, believing that they were entitled to an adjudication on the merits and protection against refiled claims, sought leave to move for summary judgment, which I granted. (Dkt. No. 133.)

Now before me for report and recommendation are: (i) the motion of Zi and Xin Wang (the Moving Defendants), filed on May 27, 2021, for summary judgment in their favor and sanctions against Troy Law (Dkt. No. 134); and (ii) plaintiff's cross-motion, filed on June 10, 2021, to drop the Moving Defendants as parties pursuant to *Rule 21*, without prejudice and with each party to bear her or his own costs. (Dkt. No. 139.) For the reasons that follow, the Moving Defendants' motion should be granted; plaintiff's cross-motion should be denied as moot; and Troy Law should be required to pay the Moving Defendants' reasonable attorneys' fees **[*5]** and

costs incurred to obtain that result.

# I. BACKGROUND

## A. Facts

The following facts, which are undisputed unless otherwise noted, are taken from the Moving Defendants' Rule 56.1 Statement of Material Facts (Def. 56.1 Stmt.) (Dkt. No. 134-1); the underlying evidentiary materials, including the declarations of Zi and Xin Wang and the Ke deposition transcript; plaintiff's Counter-Statement of Material Facts (Pl. 56.1 Stmt.) (Dkt. No. 141); the underlying evidentiary materials, including plaintiff's pre-deposition affidavits and interrogatory answers, all of which were printed and signed by her in English, *see* Ke Aff. (Dkt. No. 70-5); Second Ke Aff. (Dkt. Nos. 80, 87); Ke Interrog. Ans. (Dkt. No. 135-5); the Troy declaration; and other materials in the record, as permitted by *Fed. R. Civ. P. 56(c)(3)*.

Plaintiff worked at JR Sushi from January 6, 2017 through August 10, 2019. Ke Aff. ¶ 3; Second Ke Aff. ¶ 1; Ke Dep. Tr. 10. Defendant Kai Tuan Wang — known to plaintiff as "boss" — hired her. Ke Dep. Tr. 33-36; *see also id.* at 93 ("Q. Who is your boss? A. Kai Tuan Wang."). Kai Tuan Wang "arranged and handled" plaintiff's "daily work assignment[s]," *id.* at 64, "supervised" her "day-to-day work," *id.* at 33, set her work schedule, **[*6]** *id.* at 36, paid her wages, *id.* at 64, and decided whether to give her a raise. *Id.* Plaintiff clearly testified that Kai Tuan Wang was "the only person" who supervised her, set her schedule, and determined her work conditions and pay. *Id.* at 79. He was also "the person who kept [her] employment record[s] at JR Sushi." *Id.* at 79-80.[1]

---

[1] Notwithstanding her unequivocal deposition testimony, plaintiff now asserts, in her Counter-Statement of Material Facts (electronically signed by attorney Troy), that Zi Wang "supervised" plaintiff, "supervised and controlled employee work schedules and conditions of employment," "had the power" to hire and fire employees (though he did not hire or fire her), "determined employee rates and methods of payment" (though not for her), and "kept and maintained employee records" (other than hers) for JR Sushi. Pl. R. 56.1 Stmt. ¶¶ 4-18, 26-32. As discussed in more detail below, these assertions, in turn, are based upon Ke's pre-deposition interrogatory answers, in which she averred in identical (and wholly conclusory) terms, *quoting her own complaint*, that "Defendant Zi Wang 'had the power to hire and fire employees

2022 U.S. Dist. LEXIS 22776, *6

Defendant Zi Wang, who was 24 years old when he signed his declaration in 2021, was a full-time college student at Fordham University until 2019 (the last year of plaintiff's work at JR Sushi). Zi Wang Decl. ¶¶ 1, 3. He never had any ownership interest in JR Sushi. Def. R. 56.1 Stmt. ¶ 2; Pl. R. 56.1 Stmt. ¶ 2.; Zi Wang Decl. ¶ 4. During plaintiff's employment at JR Sushi, Zi Wang worked some Saturday and Sunday shifts. As Ke explained at deposition, "the boss would tell his son to come to work if there's no one else on a Saturday." Ke Dep. Tr. at 80. Asked if she had any personal interaction with Zi Wang, plaintiff testified that if something was "not working right in the restaurant, I would tell Zi Wang to tell his father." *Id.* at 80-81. She considered Zi Wang a friend and testified, "We all regarded him as a good younger brother." *Id.* **[*7]** at 81.

It is undisputed that Zi Wang did not hire or fire plaintiff — or any other JR Sushi employee. Def. R. 56.1 Stmt. ¶¶ 5, 12-13; Pl. R. 56.1 Stmt. ¶¶ 5, 12-13.[2] It is similarly undisputed that he did not determine plaintiff's rate or

of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records for J R SUSHI 2 INC d/b/a JR Sushi 2.'" Ke Interrog. Ans. at 13-14 (quoting Am. Compl. ¶ 40).

Plaintiff further asserts, in her Counter-Statement of Material Facts, that Xin Wang was a "manager" at JR Sushi who had "the authority to change the prices of menu items, which directly impacted Defendants' business," and that she "worked full-time at JR Sushi in the past." Pl. R. 56.1 Stmt. ¶¶ 67-73. In fact, according to plaintiff's deposition testimony, Xin Wang changed the prices only when called in for that purpose by "the boss or the boss' wife," who would "tell their daughter to come and make the adjustments" whenever they "felt there was a need to adjust the prices." Ke Dep. Tr. at 59. Plaintiff's assertion about Xin Wang's past employment finds no better support in the record. The *only* citation plaintiff provides is to her own unsourced hearsay testimony that she "heard" that Xin Wang "worked in that restaurant in the past," as a waitress. Ke Dep. Tr. at 82.

[2] In her Counter-Statement of Material Facts, plaintiff states that she "[l]ack[s] information to admit or deny" these facts. Pl. R. 56.1 Stmt. ¶¶ 12-13. They are therefore deemed admitted. *See* Local Civ. R. 56.1(c) (to the extent not "specifically controverted" by the non-moving party, the statement of material facts submitted by the moving party may be "deemed to be admitted for purposes of the motion"); *see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003)* ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

method of payment or maintain her employment records. Def. R. 56.1 Stmt. ¶¶ 10-11; Pl. R. 56.1 Stmt. ¶¶ 10-11. Zi Wang further attests — without any evidentiary contradiction — that he never hired, fired, determined the rate of pay, work schedule, workload, or employment conditions of, kept employment records for, or supervised *any* employee of JR Sushi, and never had any authority to do so. Def. 56.1 Stmt. ¶¶ 7-39; Zi Wang Decl. ¶¶ 6-7.[3]

Defendant Xin Wang, who was 30 years old when she signed her declaration in 2021, is a full-time schoolteacher and has been since 2016 — before plaintiff began working at JR Sushi. Def. R. 56.1 Stmt. ¶ 42; Pl. R. 56.1 Stmt. ¶ 42; Xin Wang. Decl. ¶¶ 2, 5. She never had any ownership interest in either restaurant. Def. R. 56.1 Stmt. ¶¶ 43-44; Pl. R. 56.1 Stmt. ¶¶ 43-44. During plaintiff's employment at JR Sushi, if "the boss or the boss' wife felt there was a need to adjust the prices," they "would tell their daughter to come and make the adjustments" on the computer. Ke **[*8]** Dep. Tr. at 59. Asked how often Xin Wang came to the restaurant, plaintiff testified that "sometimes it takes several months for her to come once," and that she saw Xin Wang "[m]aybe three times" during her entire tenure at JR Sushi. Ke Dep. Tr. at 59-60, 83. "When she was there, she would be gone as soon as she finished her work," in less than "two hours." *Id.* at 83-84. Once, when Xin Wang was there at a mealtime, "the boss told me to make one for her." *Id.* at 84. Plaintiff "never talked to her personally," and had no other knowledge about "what Xin Wang did." *Id.* at 60, 84; *see also id.* at 63 ("What she does, I don't know.").

It is undisputed that Xing Wang did not hire, fire, or supervise plaintiff — or any other JR Sushi employee. Def. R. 56.1 Stmt. ¶¶ 46-48, 53-55; Pl. R. 56.1 Stmt. ¶¶ 46-58, 53-55. It is also undisputed that Xin Wang never determined the rate of pay, work schedule, workload, or employment conditions of, kept employment records for, or supervised *any* employee of JR Sushi. Def. R. 56.1 Stmt. ¶¶ 49-52, 55-66. Xin Wang further attests — without any evidentiary contradiction — that she never had any *power* to hire, fire, supervise, determine the rate of pay, work schedule, workload, or employment **[*9]** conditions of, or keep employment records for, any employee of JR Sushi. Def. 56.1 Stmt.

[3] Plaintiff attempts to controvert some of these facts, *see* Pl. R. 56.1 Stmt. ¶¶ 7-39, but points to no admissible evidence supporting her counter-statement. *See supra* n.1; *infra* n.5.

¶¶ 67-80; Xin Wang Decl. ¶¶ 7-9.[4]

At her deposition, plaintiff testified that she was "not aware" that she had sued either Zi Wang or Xin Wang. Ke Dep. Tr. at 81, 84. All she knew was that she was suing "two persons, the boss and the boss's wife." *Id.* at 67. Plaintiff was confident that she "didn't include Zi Wang," *id.* at 82, and repeated — at least seven times, in total — that she was "only" suing "the boss and the boss' wife." *Id.* at 63, 70, 81-82, 90-91, 98. Plaintiff further testified that she had "no right to sue Zi Wang," *id.* at 82, and "no reason whatsoever to sue Xin Wang." *Id.* at 84.

There is no admissible evidence in the record before this Court that contradicts plaintiff's deposition testimony on this point (*i.e.*, that she did not know she was suing Zi and Xin Wang). John Troy, the managing attorney at Troy Law, attempts to undermine his client's testimony by pointing to her pre-deposition affidavits and interrogatory answers, which bear her signature and list Zi and Xin Wang as defendants in their captions.[5]

_____

[4] Plaintiff attempts to controvert these facts, *see* Pl. R. 56.1 Stmt. 67-80, but points to no admissible evidence supporting her counter-statement. *See supra* n.1; *infra* n.5.

[5] Additionally, plaintiff's original affidavit, submitted in connection with her collective certification motion, mentions the Moving Defendants in a single paragraph, as follows: "In addition to RUI YANG, Defendants YUKWAH KWOK CHENG, KAI TUAN WANG, XIN WANG, RUI YANG (a/k/a Ruifeng Yang, a/k/a Rui Feng Yang, a/k/a Jane Doe) and ZINN WANG (a/k/a ZI WANG, a/k/a John Doe) also serve as shareholder, directors, officers, and/or managers of 'JR Sushi 2' and/or 'Famous Sichuan.'" Ke Aff. ¶ 7. Her second affidavit, submitted in further support of her collective certification motion, states that Zi Wang "worked at JR Sushi on Saturdays for the whole day as a waiter," but does not state or suggest that he was an owner or a manager, and does not mention Xin Wang outside of the caption. Second Ke Aff. ¶¶ 63-64. In her interrogatory answers, plaintiff states that "ZINN WANG a/k/a/ Zi Wang a/k/a John Doe supervised Plaintiff." Ke Interrog. Ans. at 10. However, asked for the "facts and circumstances" that "substantiate" the allegations of paragraph 40 of the Amended Complaint (characterizing Zi Wang as a supervisor), plaintiff instead *reproduces* paragraph 40 of the Amended Complaint, as follows: "Subject to and without waiving any objections, Plaintiff states that Defendant Zi Wang 'had the power to hire and fire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records for J R SUSHI 2 INC d/b/a JR Sushi 2.'" Ke Interrog. Ans. at 13-14 (quoting Am. Compl. ¶ 40). The interrogatory answers, like Ke's second affidavit, do

However, these documents are all written (and signed) in English, [*10] which plaintiff cannot read. Ke Dep. Tr. at 96. Each includes a declaration by Ellen Chen, notarized Aaron B. Schweitzer, the managing associate of Troy Law, stating that Chen provided a "true and accurate translation" of the document. Ke Aff. at 24; Second Ke Aff. at 8; Ke Interrog. Ans. at 18. However, Chen does not state *when* she provided the translations, which were apparently oral, or whether she translated the captions.

Attorney Troy also submits his own declaration, in which he states that plaintiff's deposition testimony, to the effect that "she didn't know she was suing Zi Wang or Xin Wang," was "not correct." Troy Decl. ¶¶ 19-20. As support for this conclusion, Troy points out that Xin Wang was listed as a defendant in plaintiff's original Complaint (Dkt. No. 1), which was prepared by another law firm, and states that during her intake session with Troy Law, plaintiff "identified Xin Wang as the boss's daughter, and Zinn Wang as his son," which prompted Troy Law to add Zi Wang as a defendant in the Amended Complaint in place of a John Doe defendant. Troy Decl. ¶¶ 4-10. Troy attaches what appear to be attorney notes (some handwritten, mostly in Chinese, and some typed, [*11] mostly in English) mentioning both Xin Wang and Zi Wang. *Id.* Exs. 1-3 (Dkt. Nos. 140-1 through 140-3). However, he does not attest that plaintiff ever directed or authorized him to sue the Moving Defendants, nor that he ever told her plainly that she was doing so. Moreover, plaintiff did not make any corrections to her deposition transcript. *See* Ke Dep. Tr. at ECF page 112 (blank errata sheet). Nor did she submit any new declaration in opposition to the Moving Defendants' motions.

## B. Procedural History

Plaintiff filed this action on August 6, 2019. The next day, the Hon. Paul A. Engelmayer, United States District Judge, referred it to me for general pretrial management. (Dkt. No. 5.) On February 12, 2020, plaintiff filed her Amended Complaint, which the Moving Defendants answered on March 13 and May 6, 2020. (Dkt. Nos. 49, 58.) On June 3, 2020, plaintiff filed a motion for conditional collective certification. (Dkt. No. 69.) Defendants opposed that motion and certain defendants, including Zi Wang, cross-moved for summary judgment. (Dkt. No. 74.)[6] On January 15,

_____

not mention Xin Wang outside of the caption.

[6] In support of the cross-motion, Zi Wang submitted a

2022 U.S. Dist. LEXIS 22776, *11

2021, I granted plaintiff's motion for conditional certification of a collective limited to non-managerial, non-exempt employees **[*12]** at JR Sushi. (Dkt. No. 95.) On January 28, 2021, with the consent of the parties, I deemed the cross-motion for summary judgment withdrawn, without prejudice to renewal after discovery closed. (Dkt. No. 98.)

Discovery was scheduled to close on November 25, 2020, but on December 17, 2020, plaintiff asked that it be re-opened for 90 days "for the purpose of taking the parties' depositions." (Dkt. No. 93.) I granted that request, extending the discovery period to February 25, 2021, but warned that "[n]o further extensions will be granted." (Dkt. No. 94.) During the 90-day extension, Troy Law did not take even one deposition. Instead, on February 25, 2021, plaintiff asked for an even longer extension, until June 6, 2021. (Dkt. No. 115.) I granted that application in part, giving plaintiff a month, through March 31, 2021, to take no more than two party depositions. *See* Order dated March 1, 2021 (March 1 Order) (Dkt. No. 118) at 2. Additionally, I ordered plaintiff to show cause why she should not be sanctioned pursuant to *Fed. R. Civ. P. 16(f)(1)(C)* "for her failure to conduct any party depositions during the period allotted for them or to seek a further extension until the day on which that period expired," *id.,* **[*13]** and directed that:

> Prior to making *any* further motion in this case, seeking *any* relief, for *any* reason . . . the moving party shall meet and confer with all other parties in good faith and in real time (*e.g.*, via telephone or videoconference; an exchange of emails or text messages will not suffice) in an effort to negotiate a result to which all parties can agree. A party receiving a request for such a meet-and-confer shall respond to it promptly and in good faith.

March 1 Order at 2-3 (emphases in the original).[7]

---

declaration attesting (much as he does now) that he was a full-time college student until 2019; that he had no ownership interest in or management responsibilities for JR Sushi; that he did not supervise plaintiff or any other restaurant employees; and that his involvement with the restaurant was limited to "the occasions when I would go there to have meals and my father would ask me to help him out by performing some work at the JR [Sushi] Restaurant." Declaration of Zi Wang dated June 24, 2020 (Dk. No. 76-5) ¶¶ 4, 8-9.

[7] In response to the show-cause order, plaintiff's counsel explained, in substance, that Troy Law was too busy to conduct any discovery during the extended 90-day period requested for that purpose. (Dkt. No. 119.) On March 15, 2021, after analyzing counsel's failings, I determined that non-

Defendants took plaintiff's deposition on the last day of the extended discovery period. Three days later, on April 3, 2021, defendants' counsel sent a joint letter (dated April 2, 2021) to plaintiff's counsel, by email, demanding that plaintiff dismiss the action as against Zi and Xin Wang. Xue Decl. ¶ 9 & Ex. G (Dkt. No. 135-7); Troy Decl. ¶ 21. Receiving no reply for the next 13 days, defendants' counsel telephoned Troy Law on April 16, 2021, in an effort to meet and confer in compliance with the March 1 Order, but the receptionist "declined to take [a] message" and instead suggested that counsel send an email, which they did. Xue Decl. ¶ 10 & Ex. H (Dkt. No. 135-8). That **[*14]** same day, attorney Troy replied, by email, that he would "be willing to drop Zi Wang and Xin Wang with each party to bear its own costs pursuant to *Rule 21*." Xue Decl. ¶ 11 & Ex. I, at ECF page 2; Troy Decl. ¶ 21.

On April 23, 2021, defendants' counsel emailed Troy Law a proposed stipulation of dismissal with prejudice pursuant to *Rule 41(a)(1)(A)(ii)*. Xue Decl. ¶ 12 & Ex. I, at ECF page 2; Troy Decl. ¶ 22 & Ex. 6. Four days later (after two reminder emails, *see* Xue Decl. Ex. I, at ECF page 1; *id.* Ex. J, at ECF page 2), Troy Law transmitted a modified version of the proposed stipulation in which the *Rule 41(a)(1)(A)(ii)* dismissal would be without prejudice. Xue Decl. ¶ 15 & Ex. I, at ECF page 1, *id.* Ex. J, at ECF page 1; Troy Decl. ¶ 23 & Ex. 7. Defendants' counsel objected, stating that if plaintiff refused to dismiss with prejudice they would seek summary judgment and sanctions on behalf of Zi and Xin Wang. Xue Decl. ¶¶ 16-17 & Ex. I, at ECF page 1. In the same email, defendants' counsel again requested to meet and confer, reminding their adversaries that the March 1 Order required it. *Id.* Troy Law ignored the request for a meet-and-confer. Instead, replying by email two days later, attorney Troy wrote, "[T]his is an FLSA case, **[*15]** and without a finding of fairness we may not stipulate to dismissal of a defendant with prejudice. But if you want to fight on this point, let's fight." Troy Decl. ¶ 24 & Ex. 8, at ECF page 1; Xue Decl. ¶ 19.

And fight they did. On April 30, 2021, the Moving Defendants sought a pre-motion conference in anticipation of moving for summary judgment and

---

monetary sanctions were appropriate and ordered that "in the event any additional plaintiffs opt in to this action, Troy Law shall furnish each such plaintiff with a copy of this Order, both in English and in Chinese, and shall file a certificate attesting that it has done so (together with a copy of the Chinese translation) along with any consent-to-sue form filed on behalf of such plaintiff." Sanctions Order (Dkt. No. 122) at 5. No additional plaintiffs have opted in to this action.

2022 U.S. Dist. LEXIS 22776, *15

sanctions. (Dkt. Nos. 124, 125.) In response, attorney Schweitzer explained that plaintiff refused to dismiss the Moving Defendants with prejudice because such a dismissal would require court approval under *Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199, 206 (2d Cir. 2015)*, and the dismissal of Zi and Xin Wang for no consideration "would not pass muster under *Cheeks*." (Dkt. No. 126.) Plaintiff urged the Court to avail itself of "a simpler avenue of proceeding" and drop the Moving Defendants pursuant to *Rule 21*, without prejudice and with each party to bear its own costs. (*Id.*)

During a pre-motion conference before me on May 20, 2021, attorney Schweitzer argued again that plaintiff could not stipulate to a with-prejudice dismissal of the Moving Defendants without running afoul of *Cheeks*, and again invited the Court to drop the Moving Defendants under *Rule 21*, *sua sponte*, without motion practice and without prejudice. *See* Order **[*16]** dated May 24, 2021 (May 24 Order) (Dkt. No. 133) at 2. Defendants' counsel, for their part, offered to draft a "*Cheeks* review letter," *id.*, and the Court "indicated that [it] would be open to approving a voluntary dismissal with prejudice under *Cheeks*," Troy Decl. ¶ 29. When asked, at that point, why he continued to resist a with-prejudice dismissal, attorney Schweitzer stated that an adjudication on the merits "would expose my client to various forms of sanctions." May 24 Order at 2. When the Court pointed out that plaintiff would be in a worse position should the Moving Defendants make and win a summary judgment motion, attorney Schweitzer momentarily agreed to a dismissal with prejudice — only to change his mind immediately thereafter, telling the Court that he "did not appreciate being railroaded here." *Id.* Consequently, I authorized the Moving Defendants to move for summary judgment and plaintiff to cross-move for a dismissal without prejudice. *Id.* at 3.

On May 27, 2021, the Moving Defendants filed their joint motion, seeking summary judgment pursuant to *Fed. R. Civ. P. 56* and sanctions pursuant to *28 U.S.C. § 1927* and the Court's inherent authority, together with the supporting papers described above and a memorandum of law **[*17]** (Def. Mem.) (Dkt. No. 138). On June 10, 2021, plaintiff filed her opposition papers and cross-motion to drop the Moving Defendants pursuant to *Rule 21*, together with the supporting papers described above and a memorandum of law (Pl. Mem) (Dkt. No. 143). On June 17, 2021, the Moving Defendants filed their reply memorandum of law (Def. Reply) (Dkt. No. 145).

## II. LEGAL STANDARDS

### A. Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 128-29 (2d Cir. 1996)*. The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Fed. R. Civ. P. 56(c)*; *Celotex, 477 U.S. at 323*; *Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002)*. In evaluating the record, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008)*. "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Frost v. New York City Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020)* (quoting *Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996)*).

If the moving party meets **[*18]** its initial burden, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Celotex, 477 U.S. at 322*; *Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 165 L. Ed. 2d 697 (2006)*; *Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001)*. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. To defeat summary judgment, she must present specific, admissible evidence in support of her contention that there is a genuine dispute as to the material facts. *Celotex, 477 U.S. at 324*; *see also Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)* (the nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful") (quoting *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)*). The evidence must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *Anderson, 477 U.S. at 248*; *see also Nick's Garage, Inc. v. Progressive Casualty Ins. Co., 875 F.3d 107, 113 (2d Cir. 2017)* ("A

genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") (internal quotation marks omitted). Thus, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)*.

## B. Local Civil Rule 56.1

In this District, the moving party must submit a "short and concise statement, in numbered paragraphs," of the material facts that it contends to be undisputed. Local Civ. R. 56.1(a). The non-moving party must then respond in kind, with numbered paragraphs **[\*19]** that correspond "to each numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b). To the extent not "specifically controverted" by the non-moving party, the statement of material facts submitted by the moving party may be "deemed to be admitted for purposes of the motion." Local Civ. R. 56.1(c); *see also Giannullo, 322 F.3d at 140*. Each statement asserting, or controverting, a statement of material fact "must be followed by citation to evidence which would be admissible, as required by *Fed. R. Civ. P. 56(c)*." Local Civ. R. 56.1(d).

## C. The FLSA and the NYLL

The FLSA establishes minimum wage and overtime compensation requirements binding on "employers" nationwide, *29 U.S.C. §§ 206*, *207*, and makes "employer[s]" civilly liable to wronged employees for unpaid minimum wages, unpaid overtime compensation, liquidated damages, and reasonable attorneys' fees, as well as costs. *29 U.S.C. § 216(b)*. Similarly, under the NYLL, employees can sue their "employers" for unpaid minimum wages, unpaid overtime and spread-of-hours compensation, recordkeeping penalties, liquidated damages, attorneys' fees, and costs, among other things. NYLL §§ 190 *et seq.*

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *29 U.S.C. § 203(d)*. In assessing whether an individual qualifies as an "employer" **[\*20]** under the statute, the Supreme Court has admonished that courts consider the "economic reality" of the employer-employee relationship. *Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961)*; *see also Herman v.*

*RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999)* ("[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question."). To evaluate the "economic reality" of an employer-employee relationship, the Second Circuit has traditionally considered various indicia of "formal" control, including whether the alleged employer: "(1) had the power to hire and fire the employee[], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 66-67 (2d Cir. 2003)* (quoting *Carter v. Dutchess Comm. College, 735 F.2d 8, 12 (2d Cir. 1984)*). However, although the four *Carter* factors "can be *sufficient* to establish employ[ment] status," they are not "*necessary* to establish an employment relationship." *Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 143 (2d Cir. 2008)* (emphases and alteration in the original). Relying on language drawn from *Rutherford v. Food Corp. v. McComb, 331 U.S. 722, 724-25, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947)*, the Second Circuit in *Zheng* articulated a six-part "functional" test for determining whether a defendant is an employer or a joint employer of the plaintiffs, namely:

> (1) whether [the defendant's] premises and equipment were used for the plaintiffs' work; (2) whether the [defendant] **[\*21]** had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the defendant's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [defendant] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the defendant].

*Barfield, 537 F.3d at 143* (quoting *Zheng, 355 F.3d at 72*) (additional alterations added).

Neither the *Carter* factors nor the *Zheng* factors impose a "rigid rule for the identification of an FLSA employer." *Irizarry v. Catsimatidis, 722 F.3d 99, 105 (2d Cir. 2013)* (quoting *Barfield, 537 F.3d at 143*). Rather, they offer a "nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.* (internal quotation marks omitted). Ultimately, the Second Circuit "treat[s] employment for

FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Barfield, 537 F.3d at 141-42*.

The definition of "employer" under the NYLL is "similarly expansive." **[\*22]** *Chichinadze v. BG Bar Inc., 517 F. Supp. 3d 240, 255 (S.D.N.Y. 2021)* (quoting *Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 342 (S.D.N.Y. 2005)*). Although neither the Second Circuit nor the New York Court of Appeals has spoken on the issue, "district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Inclan v. New York Hosp. Grp., Inc., 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015)* (quoting *Ho v. Sim Enters. Inc., 2014 U.S. Dist. LEXIS 66408, 2014 WL 1998237, at \*10 (S.D.N.Y. May 14, 2014)*); *see also Spicer v. Pier Sixty LLC, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010)* (FLSA and NYLL "employer" definitions are treated "coextensively").

### E. *28 U.S.C. § 1927* and the Court's Inherent Authority

Under *28 U.S.C. § 1927*, "'[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'" *Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 79 (2d Cir. 2000)* (quoting *28 U.S.C. § 1927*) (alterations in the original). The federal courts also maintain the "inherent power" to impose sanctions on parties and attorneys alike. *United States v. Seltzer, 227 F.3d 36, 39 (2d Cir. 2000)*; *see also Ransmeier v. Mariani, 718 F.3d 64, 68 (2d Cir. 2013)* (noting that "a federal court . . . may exercise its inherent power to sanction a party or an attorney who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'") (quoting *Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)*). Ordinarily, however, where the misconduct conduct at issue "could be adequately sanctioned" under the Federal Rules of Civil Procedure or a specific statute (such as *§ 1927*), the court "should **[\*23]** rely on the Rules rather than the inherent power." *Chambers, 501 U.S. at 50*.

To impose sanctions against an attorney under either *§ 1927* or its inherent authority, the court must find that "the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."

*Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986)*; *George v. Pro. Disposables Int'l, Inc., 221 F. Supp. 3d 428, 437-38 (S.D.N.Y. 2016)*. Thus, the order imposing sanctions, whether premised on *§ 1927* or the court's inherent authority, "must be supported by a finding of bad faith." *Id.* This standard is met if an attorney becomes "aware of the meritless nature of [his client's] claims," yet continues to pursue the litigation. *Baiul v. NBC Sports, 708 Fed. App'x 710, 715 (2d Cir. 2017)* (summary order); *see also Ji Li v. New Ichiro Sushi, Inc., 2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at \*9-11 (S.D.N.Y. Apr. 30, 2020)* (sanctioning Troy Law pursuant to *§ 1927* for failing to withdraw its clients' FLSA claims against certain alleged employers when it became clear, through plaintiffs' testimony at trial, that those claims were "entirely meritless"), *aff'd sub nom. Li v. New Ichiro Sushi Inc., 2021 U.S. App. LEXIS 37789, 2021 WL 6105491 (2d Cir. Dec. 21, 2021)* (summary order).

There is an exception to the bad-faith requirement: If a district court relies on its inherent authority to sanction "misconduct by an attorney that involves that attorney's violation of a court order," or "other misconduct that is not undertaken for the client's benefit," the court "*need not* find bad faith **[\*24]** before imposing a sanction." *Seltzer, 227 F.3d at 42* (emphasis added); *see also, e.g., Williams v. Lutheran Med. Ctr., 776 Fed. App'x 730, 731 (2d Cir. 2019)* (no showing of bad faith needed where attorney misconduct at issue was not inherent to client's representation). Under this exception, the court may "police the conduct of attorneys as officers of the court," and "sanction attorneys for conduct not inherent to client representation, such as, violations of court orders or other conduct which interferes with the court's power to manage its calendar and the courtroom without a finding of bad faith." *Seltzer, 227 F.3d at 42*.

## III. DISCUSSION

### A. The Moving Defendants Are Entitled to Summary Judgment

The undisputed material facts as to the Moving Defendants lead to only one conclusion: neither Zi Wang nor Xin Wang was plaintiff's employer. I discuss each Moving Defendant in turn.

#### 1. Zi Wang

During plaintiff's employment at JR Sushi, Zi Wang was a full-time college student and a part-time weekend waiter at JR Sushi, pitching in, at his father's direction, "if there's no one else on a Saturday." Zi Wang Decl. ¶ 3; Ke Dep. Tr. at 80. It is undisputed that he had no ownership interest in the restaurant; did not hire or fire plaintiff (or any other JR Sushi employee); did not determine plaintiff's rate or method [*25] of payment; and did not maintain her employment records. Def. R. 56.1 Stmt. ¶¶ 2, 5, 10-13; Pl. R. 56.1 Stmt. ¶¶ 2, 5, 10-13. Thus, the parties are agreed that three of the four *Carter* factors are not satisfied. *See Zheng, 355 F.3d at 66-67* (quoting *Carter, 735 F.2d at 12*).

As to the remaining *Carter* factor — whether the alleged employer "supervised and controlled employee work schedules or conditions of employment," *id.* at 67 — plaintiff *contends* that there is a dispute, *see* Pl. 56.1 Stmt. ¶¶ 7-9, but offers no *evidence* to support her repeated but wholly conclusory assertion that "Zi Wang supervised Yi Mei Ke, and supervised and controlled work schedules and conditions of employment" at JR Sushi. *Id.* Instead, she relies on her pre-deposition interrogatory answers, which are themselves worthless boilerplate,[8] and portions of her deposition testimony,

which provide no support whatsoever for her contention.[9]

After construing the record in the light most favorable to plaintiff, I cannot find even a shred of specific, admissible evidence, *Celotex, 477 U.S. at 324*, to suggest that Zi Wang "supervised" plaintiff or "controlled" her work schedule or conditions of employment. Nor is there any evidence that plaintiff "worked exclusively or predominantly" for Zi Wang, [*26] *Zheng, 355 F.3d at 72*,[10] or was otherwise subject to his control, either formally or functionally. Since the "economic reality" is that defendant Zi Wang was not plaintiff's employer, he is entitled to summary judgment on her FLSA and NYLL claims. *See Zheng, 355 F.3d at 66-67*; *Carter, 735 F.2d at 12*; *Inclan, 95 F. Supp. 3d at 511*; *Spicer, 269 F.R.D. at 335 n.13*.

## 2. Xin Wang

The evidence concerning Xin Wang is, if anything, even more one-sided. She held down a full-time job as a schoolteacher throughout plaintiff's employment at JR Sushi. The parties are agreed that *none* of the four *Carter* factors, and *none* of the applicable *Zheng* factors, can be satisfied: Xin Wang had no ownership interest in the restaurant; did not hire or fire plaintiff (or any other JR Sushi employee); did not supervise plaintiff (or any other JR Sushi employee); did not control plaintiff's work schedule (or the schedule of any other JR Sushi employee); did not control plaintiff's conditions of employment (or those of any other JR Sushi employee); did not determine the rate and method of

---

[8] Interrogatory No. 16 asked plaintiff to identify the individuals responsible for, among other things, supervising her performance. In relevant part, she answered: "ZINN WANG a/k/a Zi Wang a/k/a John Doe supervised Plaintiff." Ke Interrog. Ans. at 10. Interrogatory No. 25 asked her to set forth the "facts and circumstances to substantiate" ¶ 40 of her Amended Complaint, which alleged that Zi Wang "had the power to hire and fire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records" for JR Sushi. In response, plaintiff did not identify a single fact or describe a single circumstance. Instead, she parroted back the language of her pleading: "Defendant Zi Wang 'had the power to hire and fire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records for J R SUSHI 2 INC d/b/a JR Sushi 2.'" Ke Interrog. Ans. at 14 (quoting Am. Compl. ¶ 40).

To be clear: these interrogatory answers fail to raise a genuine issue of disputed material fact not because they are "inconsistent" with plaintiff's later deposition testimony, *see* Pl. Mem. at 14-15 (arguing that courts should not attempt to resolve inconsistent testimony on summary judgment), but because they include only "conclusory statements," *Kulak, 88 F.3d at 71*, which "will not defeat summary judgment." *Id.*; *see also, e.g., Livingston v. City of New York, 563 F. Supp. 3d*

201, 2021 U.S. Dist. LEXIS 185019, 2021 WL 4443126, at *29 (S.D.N.Y. Sept. 28, 2021)* (granting summary judgment for defendants on hostile work environment claim after considering "only the specific comments identified by Plaintiff, rather than his sweeping assertions," such that he was subject to "belittling comments").

[9] To the contrary: on the cited pages of her deposition transcript, plaintiff testified that Kai Tuan Wang (her "boss") is "the only one" who set her work conditions, that "the boss would tell his son [Zi Wang] to come to work if there's no one else on a Saturday," and that she sometimes used Zi Wang as a messenger: "If there is something not working right in the restaurant, I would tell Zi Wang to tell his father." Ke Dep. Tr. at 80-81; *see also id.* at 105 (plaintiff asked Zi Wang "to get the boss").

[10] The other *Zheng* factors either do not apply to an individual defendant or overlap with the *Carter* factors.

payment for plaintiff (or for any other JR Sushi employee); and did not maintain plaintiff's employment records (or those of any other JR Sushi employee). Def. R. 56.1 Stmt. ¶¶ 43, 46-59; Pl. R. 56.1 Stmt. ¶¶ 43, 46-59. Moreover, Xin Wang came to the restaurant rarely — plaintiff testified [*27] that she saw her boss's daughter "[m]aybe three times," Ke Dep. Tr. at 83 — and only when "the boss or the boss' wife felt there was a need to adjust the prices," at which point they "would tell their daughter to come and make the adjustments" on the computer, *id.* at 59, which took her no more than two hours. *Id.* at 83-84.

As against these undisputed facts, plaintiff offers one entirely fanciful conclusion (that "Xin Wang was a manager at JR Sushi"), ungrounded in any record evidence; one misleading statement (that Xin Wang had "authority to change the prices of menu items") which neglects to mention that she "chang[ed] the prices" only when directed to do so by her parents; and one wholly irrelevant fact (that Xin Wang "worked full-time at JR Sushi in the past") which is itself supported only by plaintiff's hearsay testimony that she "heard" it from an unnamed source. *See* Pl. 56.1 Stmt. ¶¶ 45, 48, 67; Ke Dep. Tr. at 59, 82. In short, the record is entirely devoid of any evidence suggesting that Xin Wang was plaintiff's employer — much less "hard evidence," *Jeffreys, 426 F.3d at 554*, sufficient for a reasonable juror to return a verdict in plaintiff's favor, as required to defeat summary judgment. *Anderson, 477 U.S. at 248*; *Nick's Garage, 875 F.3d at 113*.

Since [*28] both Moving Defendants are entitled to summary judgment under the FLSA and the NYLL, all of plaintiff's claims against them should be dismissed, on the merits, and plaintiff's cross-motion to drop the Moving Defendants as parties without prejudice pursuant to *Rule 21* should be denied as moot.

## B. The Moving Defendants are Entitled to Sanctions Pursuant to *§ 1927*

The Moving Defendants seek sanctions against plaintiff's counsel — not plaintiff herself — pursuant to *28 U.S.C. § 1927* and the Court's inherent authority. They argue that Troy Law unreasonably, vexatiously, and repeatedly multiplied these proceedings by: (1) refusing to dismiss plaintiff's claims against the Moving Defendants with prejudice in light of her deposition testimony (even after agreeing that her claims against these defendants should be dropped); (2) failing to communicate to plaintiff "the contents of [her] pleadings,

affidavits, and interrogatory responses," which in the Moving Defendants' view led to "the wrong parties being sued and unnecessary motion practice"; (3) Troy Law's prior "unreasonable delay in conducting discovery"; and (4) counsel's refusal to "promptly respond to multiple requests by [the] Moving Defendants to meet-and-confer," [*29] as required by the March 1 Order. Def. Mem. at 1-2. As a sanction, the Moving Defendants request reimbursement of their legal fees and costs incurred in defending this action from its inception. *Id.* at 2, 22.

In response, Troy Law characterizes the conduct at issue here as its "refusal to settle [plaintiff's] claims with prejudice against Zi Wang and Xin Wang, for no consideration, following her deposition where for the first time and in contradiction to all her previous statements to both current and prior counsel she said she did not want to be suing them and didn't think she had the right." Pl. Mem. at 16.[11] It then argues that a party has the "absolute right to refuse to settle," *see id.* at 17; points out that a settlement involving a with-prejudice dismissal would require court approval under *Cheeks, id.* at 17.; and offers two reasons for its refusal to "settle" by stipulating to such a dismissal: (i) that judicial approval would likely be withheld, since no consideration was offered to plaintiff, *id.* at 17-18; and (ii) to protect plaintiff Ke from further "litigation by Zi Wang or Xin Wang." *Id.* at 18. *See also* Troy Decl. ¶ 30 (explaining that, given the Moving Defendants' past [*30] litigation conduct and "confrontational posture in negotiations after [plaintiff's] deposition," he feared that "agreeing to dismissal with prejudice would expose Plaintiff to a sanctions motion and so would neither be in Plaintiff's best interest [n]or save the [Court] time and resources on motion practice"). Further, Troy Law argues, the Moving Defendants' claim that his firm was operating in bad faith and against the client's wishes from the outset is based on "speculation and insinuation" as to the interaction between Ms. Ke and her counsel during the early stages of this case. Pl. Mem. at 16. Since the present controversy was prompted by plaintiff's "first-time about-face at the very tail-end of discovery," the firm contends, any sanction

---

[11] Although Troy Law submitted a single memorandum of law — in plaintiff's name — in opposition to the Moving Defendants' motions and in support of the cross-motion, it is clear that this portion of the brief was submitted to advance the interests of the firm, not its client. In describing the arguments made in opposition to the Moving Defendants' sanctions motion, therefore, I ascribe them to Troy Law, not to plaintiff Ke.

should be limited to "that portion of the litigation which succeeded [the deposition], not which preceded it." *Id.*

## 1. Pre-Deposition Misconduct

I share the Moving Defendants' suspicion that Troy Law over-pled this case from the outset, with no colorable basis and no client authorization to sue any individual defendants other than "the boss and the boss's wife." Attorney Troy's declaration fails to quell that suspicion. I note, for example, that **[*31]** the firm's October 24, 2019 intake notes (consisting of a series of emails, mostly in English, from "troylaw@troypllc.com" to "troylaw@troypllc.com") identify Xin Wang simply as "daughter" and Zi Wang as "son." Troy Decl. Ex. 3, at ECF page 1. Nothing in those notes (which were neither authored by nor copied to plaintiff) suggests that the "daughter" or the "son" "had the power to hire and fire employees of, supervised and controlled employee work schedules and conditions of employment at, determined employee rates and methods of payment at, and kept and maintained employee records" for JR Sushi, as Troy Law alleged ("[u]pon the personal knowledge of Plaintiff") a few months later in what remains plaintiff's operative pleading, signed by attorney Troy. *See* Am. Compl. ¶¶ 30, 40. Nor do the intake notes explain Troy Law's claim that two other individuals, Yukwah Kwok Cheng and Henry Zhang (supposedly known to plaintiff as "uncle"), were also plaintiff's employers. *See id.* ¶¶ 24, 44.[12]

Ke's deposition testimony also raises questions as to whether Troy Law translated the full contents, or explained the purpose, of the various English-language documents that the firm asked her to sign.[13]

---

[12] At deposition, Ke testified that she did not know she had sued Cheng, whose name she appeared not to recognize, or Zhang, whom she described as "a waiter." Ke Dep. Tr. at 62-63, 67-70. Because neither of these defendants has appeared or answered, the viability of plaintiff's claims against them is not directly at issue on the present motion.

[13] For example, although plaintiff testified generally that "there was a translation" of the affidavit she submitted in support of her collective certification motion, Ke Dep. Tr. at 86, she was clearly unaware that she had made such a motion, and in fact testified that that she did not "have the right" to represent her co-workers. *Id.* at 91-92. Additionally, plaintiff denied any knowledge of the notice that her attorneys sent out to invite other employees to join this action. *Id.* at 92. Because Troy Law has never filed any consent-to-sue forms on behalf of additional plaintiffs, this Court need not determine, at present,

Attorney **[*32]** Troy's declaration does nothing to answer these questions. Nor is there any post-deposition declaration from plaintiff that addresses them. I note as well that Troy Law has previously been sanctioned, or threatened with sanctions, for filing evidentiary materials on behalf of non-English speaking clients that were later contradicted by the clients' live testimony.[14]

However, before the Court sanctions an attorney under § 1927 or its inherent power for pressing meritless claims, it "must find clear evidence" not only that the "claims were entirely meritless" but also that the attorney knew or should have known that they lacked merit and thus "acted for improper purposes" in filing or pursuing them. *Revson, 221 F.3d at 79*. Here, as in *Ji Li, 2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at *10*, the evidence as to Troy Law's bad faith during the early stages of this action, though troubling, is insufficiently "clear," on the present record, to warrant sanctions.[15]

---

the viability of the conditionally certified collective.

[14] *See, e.g., Lin v. Quality Woods, Inc., 2021 U.S. Dist. LEXIS 107662, 2021 WL 2343179, at *1 (E.D.N.Y. June 4, 2021)* (ordering John Troy to show cause why he should not be sanctioned for pursuing FLSA case against a "bevy of parties that Troy alleged employed Plaintiff" when in fact "they never did," which was ultimately revealed when plaintiff testified under oath that he did not know many of the alleged employers), *report and recommendation adopted, 2021 U.S. Dist. LEXIS 150447, 2021 WL 4129151 (E.D.N.Y. Aug. 10, 2021); Ji Li, 2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at *9-11* (sanctioning Troy Law where multiple plaintiffs stated in their written direct testimony, prepared by their counsel, "that Jian Ping Chen "was the 'boss' or 'lady boss' at Ichiro Sushi on Second Avenue," but "completely contradicted" that assertion in their live testimony at the bench trial); *Jianjun Chen v. 2425 Broadway Chao Rest., LLC, 331 F.R.D. 568, 570, 572-73 (S.D.N.Y. 2019)* (sanctioning Troy Law for serving discovery responses "which cannot be reconciled with Plaintiff's prior deposition testimony").

[15] The gaps in the present record are due in part to attorney Schweitzer's invocation of the attorney-client privilege during plaintiff's deposition to prevent his client from directly addressing — for example — whether anyone explained the Amended Complaint to her, Ke Dep. Tr. at 51, and whether she authorized her counsel to sue Henry Zhang. *Id.* at 69. I note, however, that attorney Troy appears to have waived both the attorney-client privilege and the work product doctrine with respect to (i) communications between his firm and Ms. Ke regarding Zi and Xin Wang and (ii) Troy Law's decision to pursue them as defendants. *See* Troy Decl. ¶¶ 7, 19-20; Pl.

2022 U.S. Dist. LEXIS 22776, *32

Moreover, the Court has already sanctioned Troy Law for its unreasonable delay in conducting discovery. *See* Sanctions Order at 5. The Moving Defendants (who apparently took advantage of that delay to conduct the Ke deposition on March 31, 2021, long after the expiration [*33] of the initial fact discovery deadline) are not entitled to additional sanctions for the same misconduct. I therefore recommend, respectfully, that no new sanctions be assessed against Troy Law for its conduct prior to plaintiff's deposition.

## 2. Post-Deposition Misconduct

Even if I assume that plaintiff initially agreed to sue Kai Tuan Wang's children — and then surprised her counsel by executing an "about-face at the very tail-end of discovery," as Troy Law now asserts, *see* Pl. Mem. at 16 — the firm's stubborn refusal to dismiss those claims on the merits, *after* plaintiff's deposition testimony made it clear that neither Zi nor Xin Wang had ever been her employer, was sanctionable. *See Baiul, 708 Fed. App'x at 715* (affirming § 1927 sanctions where attorney refused to withdraw plaintiff's claims after becoming "aware" of their "meritless nature"); *Ji Li, 2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at *9-11* (sanctioning Troy Law under § 1927 for failing to withdraw plaintiffs' FLSA claims against certain defendants in the face of the "*Rule 50*" motion" made by those defendants after plaintiffs' live testimony revealed that the claims against them were "entirely meritless"). Here, as in *Ji Li*, none of the explanations offered by Troy Law for its intransigence justifies the firm's conduct.

First, the [*34] requested stipulation of dismissal with prejudice would not have been a "settlement" (any more than, for example, an agreed-to dismissal under *Fed. R. Civ. P. 50(a)* would be a "settlement").[16] Because the

---

Mem. at 16 (asserting, albeit without any direct evidentiary support, that plaintiff spent "years . . . telling her lawyers that Xin Wang and Zi Wang were her employers and that she wanted to sue them"). As an alternative to sanctioning Troy Law only for its conduct after the Ke deposition, therefore, the Court could conduct (or direct the assigned magistrate judge to conduct) an evidentiary hearing at which plaintiff Ke and her attorneys would be required to testify as to these matters.

[16] *Rule 50(a)* "involves a determination by a judge that, based on the evidence presented, the plaintiff is not entitled to prevail against the defendant. That determination is made at trial and, if granted, entitles the prevailing party to costs." *Lapierre v. Exec. Indus., Inc., 117 F.R.D. 328, 329 (D. Conn. 1987)*. The standard applied on a *Rule 50(a)* motion for judgment as a

premise for the dismissal was plaintiff's failure of proof as to a foundational element of her claim — that the Moving Defendants were her "employers" — no settlement consideration was offered or received. Nor did the parties negotiate any other terms, provisions, obligations, or understandings. Thus, the Moving Defendants do not seek sanctions for plaintiff's "refusal to settle," Pl. Mem. at 16; instead, they seek compensation for being required to defend against plaintiff's claims even after they were revealed, by plaintiff's deposition testimony, to be "entirely meritless." *Ji Li, 2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at *10-11*.

Second, the parties' assumption that the dismissal requested by the Moving Defendants would require judicial approval under *Cheeks, 796 F.3d at 206-07*,[17] furnished no reason to balk at executing the stipulation. As attorney Troy noted, the assigned magistrate judge "indicated that she would be open to approving a voluntary dismissal with prejudice under *Cheeks*," Troy

---

matter of law is similar to the standard applied on a Rule 56 summary judgment motion: the court may grant the motion if a party "has been fully heard on an issue" and the court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Fed. R. Civ. P. 50(a)(1)*.

[17] The bright line that plaintiff's counsel attempts to draw between with-prejudice dismissals of FLSA claims (which in their view always require judicial review under *Cheeks*) and without-prejudice dismissals (which in their view never require such review) is not in fact quite so bright. Less than two weeks ago, in *Samake v. Thunder Lube, Inc., 2022 U.S. App. LEXIS 2567, 2022 WL 244143 (2d Cir. Jan. 27, 2022)*, the Court of Appeals characterized the holding of *Cheeks* as follows: "[A]ny *Fair Labor Standards Act ('FLSA') settlement* must be reviewed by the district court for compliance with that Act before the parties may dismiss a case *with prejudice* by joint stipulation pursuant to *Federal Rule of Civil Procedure 41(a)(1)(A)(ii)*." *2022 U.S. App. LEXIS 2567, [WL] at *1* (emphases added). The Second Circuit then extended the requirement of judicial review to *settlements* effected through unilateral dismissals of FLSA claims *without prejudice* pursuant to *Rule 41(a)(1)(A)(i)*. *2022 U.S. App. LEXIS 2567, [WL] at *5*. At the same time, the *Samake* panel noted approvingly that the district court's preliminary inquiry, in the case before it, was whether "the parties had . . . reached any *settlement* that would necessitate review," *2022 U.S. App. LEXIS 2567, [WL] at *1* (emphasis added), and explained that if there was no settlement, judicial review of the dismissal "may be quite limited — for instance, in this case, all that was needed was confirmation that no settlement existed." *2022 U.S. App. LEXIS 2567, [WL] at *5*.

2022 U.S. Dist. LEXIS 22776, *34

Decl. ¶ 29, and the Moving Defendants' counsel offered to prepare the "*Cheeks* review letter" for that purpose. **[*35]** May 24 Order at 2. Counsel's professed uncertainty as to whether judicial approval could be obtained — because plaintiff would "receive no settlement payment at all," Pl. Mem. at 17 — is, on the facts of this case, entirely unconvincing.[18]

Third and finally, Troy Law's pious insistence that it refused to dismiss plaintiff's claims with prejudice to protect her from "further litigation by Zi Wang or Xin Wang," Pl. Mem. at 18, is plainly pretextual. The Moving Defendants have consistently stated, since they first filed their pre-motion conference letters, that, if required to move for summary judgment, they would seek sanctions only against plaintiff's counsel, who, in their view, were "advancing this action without Plaintiff's authorization and against her consent." Zi Wang Pre-Mtn. Ltr. (Dkt. No. 124) at 4; Xin Wang Pre-Mtn. Ltr. (Dkt. No. 125) at 4.[19] Moreover, the stipulation drafted by the Moving Defendants' counsel specified not only that plaintiff's claims against Zi and Xin Wang would be dismissed "with prejudice," but also that each party would bear his or her "own costs, expenses,

---

[18] *Cabrera v. CBS Corp., 2019 U.S. Dist. LEXIS 20963, 2019 WL 502131 (S.D.N.Y. Feb. 8, 2019)*, is entirely inapposite. In that case, I rejected a proposed settlement under which the plaintiffs — who according to their lawyer had "strong" FLSA retaliation claims — agreed to dismiss those claims, with prejudice, for no consideration other than the without-prejudice dismissal of CBS's counterclaims for fraud and breach of fiduciary duty. Pointing out that the consideration was "illusory," since CBS could refile the counterclaims "at will," I reasoned that such a settlement could not pass muster under *Cheeks* "unless I assume that there is no merit whatsoever to plaintiff's claims and thus no conceivable 'range of possible recovery.'" *2019 U.S. Dist. LEXIS 20963, [WL] at *5* (quoting *Wolinsky v. Scholastic Inc., 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012)*). Since the *Cabrera* complaint had survived a motion to dismiss, and neither side had presented the Court with "even a shred of evidence going to the merits," *id.*, I could not so assume. Here, by contrast, discovery had been completed, revealing that plaintiff's claims against the Moving Defendants were in fact meritless and that they were entitled to a judgment, in their favor, on the merits. Additionally, plaintiff has never faced any counterclaims.

[19] Even if defense counsel had been less specific, the substance of plaintiff's deposition testimony, including her repeated statements that she did not intend to sue the Moving Defendants and did not know she had done so, would have made it obvious to Troy Law that the firm had more to fear from "further litigation" by the Moving Defendants than its client did.

disbursements, *and attorneys' fees* **[*36]** ," Troy Decl. Ex. 6 (emphasis added). Troy Law's refusal to sign that stipulation thus had little if anything to do with protecting its client — who would surely be better off pursuing a streamlined case against her actual employers than continuing to litigate with their children, who did not employ her and whom she did not wish to sue — and everything to do with protecting the firm itself.

Moreover, Troy Law got the law wrong. To the Moving Defendants, it mattered whether the stipulation of dismissal was with or without prejudice, because a dismissal with prejudice under *Rule 41(a)(1)(A)*, whether by notice or by stipulation, "is subject to the general rules of preclusion — res judicata and collateral estoppel — and is effective not only on the immediate parties to the action but also on their privies." 9 Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2367, at 658 (4th ed. 2020). To Troy Law, however, it did not matter whether the stipulation was with or without prejudice. This is so because, after a voluntary dismissal pursuant to *Rule 41(a)(1)(A)* — with or without prejudice — "the Court retains discretion whether to impose sanctions under its inherent power or *§ 1927*." *Crown Awards, Inc. v. Trophy Depot, Inc., 2017 U.S. Dist. LEXIS 20393, 2017 WL 564885, at *14 (S.D.N.Y. Feb. 13, 2017)*.[20] Thus, for example, in *Bolivar v. Pocklington, 975 F.2d 28, 31 (1st Cir. 1992)*, the court first **[*37]** held that even after the voluntary dismissal of plaintiff's claims by notice and without prejudice, "the district court possessed the requisite jurisdiction to impose sanctions under *Rule 11* and *section 1927*." It then affirmed a post-dismissal sanctions award against plaintiff and his counsel. *Id.* Similarly, in *Macheska v. Thomson Learning, 347 F. Supp. 2d 169 (M.D. Pa. 2004)*, the court first held that "Thomson is not barred from asserting a *§ 1927* motion subsequent to the stipulated voluntary dismissal filed in this case," and then sanctioned Macheska's counsel pursuant to *§ 1927* for pursuing her claims past the point at which he "clearly knew that his client's case lacked merit." *Id. at 180-81*.

---

[20] *See also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 412, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)* (Stevens, J., concurring in part and dissenting in part) (because "the dismissal of an action pursuant to *Rule 41(a)(1)* does not deprive the district court of jurisdiction to resolve collateral issues," a court "may impose sanctions for contempt on a party who has voluntarily dismissed his complaint or impose sanctions under *28 U.S.C. § 1927* against lawyers who have multiplied court proceedings vexatiously").

In short, Troy Law's stubborn refusal to dismiss plaintiff's meritless claims against the Moving Defendants with prejudice harmed those defendants (by requiring them to move for summary judgment to obtain a dismissal on the merits); harmed their client, plaintiff Ke (by delaying the resolution of her colorable claims against other defendants while running up her counsel's fees and costs); and failed to protect the firm itself from "further litigation" by the Moving Defendants (in the form of their pending motion for summary judgment and sanctions). Moreover, by opposing summary judgment without **[*38]** any non-frivolous basis on which to do so, Troy Law has succeeded only in further "multipl[ying] the proceedings," _28 U.S.C. § 1927_, thereby increasing its exposure to the accompanying sanctions motion. _See Baiul, 708 Fed. App'x at 715_ (affirming award of sanctions under _§ 1927_ where counsel's "refusal to dismiss the action _with prejudice_ . . . unduly multiplied the proceedings and caused unnecessary expense," including defendant's attorneys' fees incurred in making and winning a motion for judgment on the pleadings) (emphasis added).

Here, as in _Ji Li_, Troy Law "acted improperly — and, indeed, in bad faith," _2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at *10_, by pursuing plaintiff's claims against the Moving Defendants after her own deposition testimony established that they were never her employers and therefore that her claims against them were "entirely meritless" _Id. See also Baiul, 708 Fed. App'x at 715_ (bad faith was adequately established by court's determination that counsel "was aware of the meritless nature of [plaintiff's] claims, yet continued to pursue litigation in New York anyway"); _Macheska, 347 F. Supp. 2d at 181_ (awarding sanctions for defendant's costs and fees incurred after March 1, 2004, by which date plaintiff's counsel "clearly knew that his client's case lacked merit"). Consequently, the Moving Defendants' motion for sanctions **[*39]** should be granted pursuant to _§ 1927_, and they should be awarded the "excess costs, expenses, and attorneys' fees" that they incurred as a result of the refusal of plaintiff's lawyers to dismiss her claims against them on the merits once those lawyers understood — as they must have, after the deposition — that those claims could not succeed.[21]

In _Ji Li_, the sanctions commenced when defendants' counsel "made a _Rule 50_ motion" at trial. _2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at *11_. In this case, the Moving Defendants first attempted, appropriately, to obtain a stipulated dismissal. After Troy Law rebuffed their efforts by email (in violation of my recently-issued March 1 Order, which required the parties to meet and confer in "real time" and "good faith"), the Moving Defendants were obliged to submit pre-motion conference letters on April 30, 2021, attend a pre-motion conference on May 20, 2021, move for summary judgment, and oppose plaintiff's cross-motion. Under these circumstances, the "excess" costs, expenses, and attorneys' fees were those that the Moving Defendants reasonably incurred to prepare the pre-motion conference letters, attend the pre-motion conference, and undertake all motion practice thereafter.

## IV. CONCLUSION

For the reasons **[*40]** set forth above, I recommend, respectfully, that the Moving Defendants' motion for summary judgment and for sanctions (Dkt. No. 134) be GRANTED, to the extent set forth herein; that plaintiff's claims against the Moving Defendants be DISMISSED with prejudice; and that plaintiff's cross-motion to drop the Moving Defendants as parties without prejudice (Dkt. No. 139) be DENIED as moot. I further recommend that the sanction be imposed on John Troy and Aaron Schweitzer, jointly and severally, and that in order to quantify the sanction the Moving Defendants be directed to submit one or more declarations evidencing their recoverable fees and expenses, supported by properly authenticated copies of their attorneys' relevant time and expense records, including contemporaneous timesheets, as well as evidence supporting the reasonableness of counsel's rates.

Dated: New York, New York

February 7, 2022

/s/ Barbara Moses

**BARBARA MOSES**

---

[21] Because sanctions are available pursuant to _§ 1927_, there is no need for the Court to rely on its inherent power to reach the same result. _See Chambers, 501 U.S. at 50_ (noting that a trial court must "exercise caution in invoking its inherent power," particularly when the conduct at issue "could be adequately sanctioned" under "one of the other sanctioning provisions"); _Ji Li, 2020 U.S. Dist. LEXIS 77668, 2020 WL 2094095, at *11_ ("[B]ecause the Court concludes that [defendants] are entitled to _§ 1927_ sanctions, it declines to decide whether [Troy Law] should also be sanctioned pursuant to its inherent powers.").

**United States Magistrate Judge**

---

**End of Document**